# In the
# United States Court of Appeals
## For the Seventh Circuit
_____

No. 07-2303

ROGER A. CRAFT,

*Plaintiff-Appellant,*

*v.*

MICHAEL J. ASTRUE, Commissioner of
Social Security,

*Defendant-Appellee.*

_____

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 05 C 1569—**Blanche M. Manning**, *Judge.*

_____

ARGUED JANUARY 24, 2008—DECIDED AUGUST 22, 2008

_____

Before POSNER, RIPPLE, and TINDER, *Circuit Judges.*

TINDER, *Circuit Judge.* Roger Craft filed an application in August 2001 for Disability Insurance Benefits ("DIB") and an application in September 2001 for Supplemental Security Income ("SSI"), alleging a disability due to diabetes mellitus and affective/mood disorders. Both claims were denied initially and upon reconsideration.

Craft timely requested a hearing before an Administrative Law Judge ("ALJ"), which was held on October 7, 2003. The ALJ determined that Craft did not qualify for DIB or SSI because he could perform a significant number of jobs despite his limitations. The Appeals Council denied review of the ALJ's decision. The district court affirmed the ALJ's decision and denied Craft's motion to alter or amend the judgment. Upon review, we conclude that the ALJ erred in evaluating Craft's mental impairments and in making the credibility determination; accordingly, we reverse.

## I. Background

In 1994, Craft was injured at work when a forklift crushed his left foot. He experienced pain in his foot for the next three years, at which time his podiatrist, Dr. Santangelo, referred him to neurologist Dr. Sicotte. Dr. Sicotte noted that Craft had decreased sensation and strength in his foot, and the results of an EMG nerve conduction test indicated a neuropathy which was sensory in nature.[1] He did not have wide-spread

---

[1] Neuropathy is a nerve injury and can be sensory, motor, or autonomic in nature. A sensory neuropathic injury results in the sensation of pain, numbness, tingling, or burning. The sensation often begins in the feet and progresses toward the center of the body as the condition worsens. *See Peripheral Neuropathy*, http://www.nlm.nih.gov/medlineplus/ency/article/000593.htm (last visited July 17, 2008). Neuropathy is also a common

(continued...)

peripheral neuropathy. In May 1998, Craft underwent an operation on his foot, and he continued to see his podiatrist regularly until discharged from post-operative care in August 1998. Craft was also diagnosed with Type I diabetes mellitus in May 1998, after complaining of thirst, frequent urination, weight loss, and blurred vision.[2]

Craft's medical records do not indicate that he visited any doctors in 1999, but he visited Dr. Nichols for his diabetes once in September 2000. Craft applied for disability in August 2001, at the age of forty-two. On September 25, 2001, Craft reported to the emergency room at Cook County Hospital, complaining of muscle pain, frequent urination, thirst, weight loss, and weakness for the previous six months. He was given insulin and released. On October 19, 2001, Dr. Rodriguez completed a physical assessment form, finding that Craft suffered from diabetes, was twenty percent limited in several areas of physical activity, and had mild mental impairments. He was hospitalized on the same day and diagnosed with hyperglycemia secondary to medicine noncompliance. Craft reported that he had not been taking his medication due to unpleasant side effects and an inability to afford the medication.

---

[1] (...continued)
complication of diabetes. *See Diabetic Neuropathy*, http://www.nlm.nih.gov/medlineplus/ency/article/000693.htm (last visited July 17, 2008).

[2] The record does not indicate that Craft had a primary care physician, but he typically visited Cook County Hospital and the VISTA Health Center of Cook County for his medical needs.

On October 23, 2001, Dr. Shaikh examined Craft at the request of Disability Determination Services ("DDS"); Craft again reported that he had previously stopped taking his medication because he could not afford it. Dr. Shaikh noted that Craft had uncontrolled diabetes, scabbing on his left leg and varicose veins in both legs, decreased range of motion in his left knee, hip pain with normal range of motion, early retinopathy,[3] neuropathy in the left hand, loss of sensation in the left foot and lower third of the leg, and decreased memory. Dr. Frey completed a psychiatric examination of Craft on the same day, also at the request of DDS. Dr. Frey noted Craft's physical and mental complaints and diagnosed him with dysthymic disorder.[4]

On November 29, 2001, a non-examining state agency psychiatrist, Dr. Tomassetti, completed a Psychiatric Review Technique Form and a mental Residual Functional Capacity evaluation. Dr. Tomassetti noted that Craft had dysthymic disorder, he had mild impairments in three areas of mental functional limitation, and he was moderately limited in several areas relevant to his ability to work.

---

[3] Retinopathy is damage to the retina of the eye and can be caused by long-term or poorly controlled diabetes. Retinopathy results in blurry vision and can cause blindness. *See Diabetic Retinopathy*, http://www.nlm.nih.gov/medlineplus/ency/article/001212.htm (last visited July 17, 2008).

[4] Dysthymia is a chronic form of depression. *See Dysthymia*, http://www.nlm.nih.gov/medlineplus/ency/article/000918.htm (last visited July 17, 2008).

Craft visited Dr. Rodriguez again on December 31, 2001, and received prescriptions for his diabetes and neuropathy. He visited a doctor to complain that his diabetes medication was not working on April 4, 2002, and he was prescribed a different medicine. On May 4, 2002, Craft visited a doctor to complain about additional symptoms associated with his new medicine. He visited a doctor again on May 20, 2002, at which time his glucose levels were elevated.

On June 27, 2002, Craft complained about pain in his extremities, which the doctor noted might indicate neuropathy. He was again diagnosed with probable diabetic neuropathy on July 27, 2002, after he complained about pain in his extremities. On September 19, 2002, he complained of severe leg pain and an inability to sleep. On November 14, 2002, he was diagnosed with peripheral neuropathy, and he received another prescription for his neuropathy on February 13, 2003.

Dr. Dang performed a psychiatric examination of Craft by request of DDS on May 9, 2003. Dr. Dang diagnosed Craft with dysthymia and noted that Craft experienced depression, anger, difficulty with concentration, and tiredness. Dr. Dang completed a mental analysis form for Craft's ability to do work-related activities, and he found Craft to have mild and moderate limitations in several areas. On July 7, 2003, Craft reported improvement in symptoms of his neuropathy; the doctor noted a rash on Craft's legs and renewed the prescription for Craft's neuropathy medication. On October 8, 2003, Craft visited Dr. Escalona, who diagnosed Craft with diabetes,

uncontrolled diabetic neuropathy, and depression. Dr. Escalona also noted that Craft continued to have paresthesia and pain in his arms and legs despite the neuropathy medication.[5]

The hearing for Craft's disability claims was held on October 7, 2003. Craft was forty-four years old at the time. The ALJ heard testimony from Craft and his landlord, Vivian Hedemark. Craft testified that he experienced paresthesia in his arms, legs, and back, which caused him to have difficulty sleeping at night. He also complained of loss of teeth, memory loss, and weight loss. The ALJ questioned Craft as to the extent of his daily activities. Craft testified that daily activities left him exhausted. He cooked his own meals, walked to the mailbox daily, vacuumed once a week, and occasionally drove until his vehicle needed repairs that he could not afford. Hedemark testified about Craft's weight loss, memory loss, and rages that he would go into "when his diabetes [was] high." She also confirmed that Craft could not sleep at night because she could hear him walking around and watching television. After consulting with a vocational expert ("VE"), the ALJ concluded that Craft was not disabled.

---

[5] Paresthesia refers to a burning or prickling sensation that usually occurs in the hands, arms, legs, or feet. Chronic paresthesia can be a symptom of traumatic nerve damage. *See National Institute of Neurological Disorders and Stroke Paresthesia Information Page*, http://www.ninds.nih.gov/disorders/paresthesia/paresthesia.htm (last visited July 17, 2008).

## II.  Analysis

Where the Appeals Council has denied review of the ALJ's decision, we review the ALJ's decision as the final decision of the Commissioner. *Schmidt v. Astrue*, 496 F.3d 833, 841 (7th Cir. 2007). We review the ALJ's legal conclusions de novo. *Id.* We deferentially review the ALJ's factual determinations and affirm the ALJ if the decision is supported by substantial evidence in the record. *Id.* Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004). The ALJ is not required to mention every piece of evidence but must provide an "accurate and logical bridge" between the evidence and the conclusion that the claimant is not disabled, so that "as a reviewing court, we may assess the validity of the agency's ultimate findings and afford [the] claimant meaningful judicial review." *Young v. Barnhart*, 362 F.3d 995, 1002 (7th Cir. 2004).

A claim of disability is determined under a sequential five-step analysis. *See* 20 C.F.R. § 404.1520 (DIB); 20 C.F.R. § 416.920 (SSI).[6] The first step considers whether the applicant is engaging in substantial gainful activity. The second step evaluates whether an alleged physical or mental impairment is severe, medically determinable, and meets a durational requirement. The third step

---

[6] Although the Code of Federal Regulations contains separate sections for DIB and SSI, the processes of evaluation are identical in all respects relevant to this case. For simplicity, we will cite only to the DIB sections.

compares the impairment to a list of impairments that are considered conclusively disabling. If the impairment meets or equals one of the listed impairments, then the applicant is considered disabled; if the impairment does not meet or equal a listed impairment, then the evaluation continues. The fourth step assesses an applicant's residual functional capacity ("RFC") and ability to engage in past relevant work. If an applicant can engage in past relevant work, he is not disabled. The fifth step assesses the applicant's RFC, as well as his age, education, and work experience to determine whether the applicant can engage in other work. If the applicant can engage in other work, he is not disabled.

In this case, at steps one and two, the ALJ determined that Craft had not engaged in substantial gainful activity and that he had severe impairments due to insulin dependent diabetes mellitus with neuropathy and early retinopathy, a history of crush injury to the left foot, and dysthymia. At step three, the ALJ determined that the impairments did not meet or equal the listed impairments. The ALJ next determined that Craft's RFC was for a full range of light work, limited to simple, unskilled tasks. The ALJ reasoned that the RFC was appropriate because no greater or additional limitations were justified by the medical evidence and Craft's complaints were not entirely credible. At step four, the ALJ concluded that Craft could not return to his past relevant work, which consisted of driving trucks and HVAC installation. The ALJ consulted a VE who opined that Craft could engage in work as a hand packager or assembler. At step five, the ALJ agreed that Craft could engage in this work, and, therefore, concluded he was not disabled.

## A. Mental Limitations

Craft first argues that the ALJ failed to use the "special technique" to assess his mental impairments. The special technique is set forth in 20 C.F.R. § 404.1520a, and it is used to analyze whether a claimant has a medically determinable mental impairment and whether that impairment causes functional limitations. If a limitation is of listings-level severity, then the claimant is conclusively disabled. Thus, the special technique is used to evaluate mental impairments at steps two and three of the five-step evaluation. *See* SSR 96-8p.

The special technique requires that the ALJ evaluate the claimant's "pertinent symptoms, signs, and laboratory findings" to determine whether the claimant has a medically determinable mental impairment. 20 C.F.R. § 404.1520a(b)(1). If the claimant has a medically determinable mental impairment, then the ALJ must document that finding and rate the degree of functional limitation in four broad areas: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation. *Id.* § 404.1520a(c)(3). These functional areas are known as the "B criteria." *See* 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00 et seq.

The first three functional areas are rated on a five-point scale of none, mild, moderate, marked, and extreme. 20 C.F.R. § 404.1520a(c)(4). The final functional area is rated on a four-point scale of none, one or two, three, and four or more. *Id.* The ratings in the functional areas correspond to a determination of severity of mental impairment. *Id.* § 404.1520a(d)(1). If the ALJ rates the first three functional

areas as none or mild and the fourth area as none, then generally the impairment is not considered severe. *Id.* Otherwise, the impairment is considered severe, and the ALJ must determine whether it meets or is equivalent in severity to a listed mental disorder. *Id.* § 404.1520a(d)(2). If the mental impairment does not meet or is not equivalent to any listing, then the ALJ will assess the claimant's RFC. *Id.* § 404.1520a(d)(3). The ALJ must document use of the special technique by incorporating the pertinent findings and conclusions into the written decision. *Id.* § 404.1520a(e)(2). The decision must elaborate on significant medical history, including examination and laboratory findings, and the functional limitations that were considered in reaching a conclusion about the mental impairment's severity. The decision must also incorporate "a specific finding as to the degree of limitation in each of the functional areas." *Id.*

In this case, the ALJ determined at step two that Craft had "severe" limitations due to insulin dependent diabetes mellitus with neuropathy and early retinopathy, a history of crush injury to the left foot, and dysthymia. As the government concedes, the ALJ did not apply the special technique to determine the severity of Craft's mental impairments. The ALJ implicitly found that Craft's dysthymia was a medically determinable impairment but then apparently jumped to the conclusion that the dysthymia was severe without discussing Craft's mental medical history or rating the severity of the four functional areas of limitation. The ALJ did recite some of Craft's mental medical history in the RFC analysis; however, the RFC analysis is not a substitute for the special technique,

even though some of the evidence considered may overlap. *See* SSR 96-8p. The ALJ explicitly stated that Craft's limitations from his physical and mental impairments did not individually or in combination meet or equal a listed impairment.

The government argues that the ALJ's failure to use the special technique is harmless because Craft has not shown that consideration of the B criteria would have resulted in a determination of disability due to a listings-level impairment. After all, the ALJ did determine that Craft had a severe mental impairment and considered whether it met or equaled a listed impairment, as required by the final step of the special technique. Under some circumstances, the failure to explicitly use the special technique may indeed be harmless error. *See, e.g.*, *Keys v. Barnhart*, 347 F.3d 990, 994 (7th Cir. 2003) (finding harmless error where an older version of a regulation was used because the outcome would have been the same under the new regulation). We cannot conclude that it was harmless here because the ALJ's failure to consider the functional impairments during the special technique analysis was compounded by a failure of analysis during the mental RFC determination, as we will discuss further. Ultimately, the ALJ gave short shrift to potential limitations caused by Craft's mental impairments, and that error requires a remand.

Craft next argues that the ALJ failed to determine a proper mental RFC for Craft, resulting in the VE being given a flawed hypothetical, which affected the ALJ's determination of Craft's non-disability at step five of the

analysis. The RFC is the maximum that a claimant can still do despite his mental and physical limitations. 20 C.F.R. § 404.1545(a)(1); SSR 96-8p. It is based upon the medical evidence in the record and other evidence, such as testimony by the claimant or his friends and family. 20 C.F.R. § 404.1545(a)(3). The ALJ is required to determine which treating and examining doctors' opinions should receive weight and must explain the reasons for that finding. *Id.* § 404.1527(d), (f).

When determining the RFC, the ALJ must consider all medically determinable impairments, physical and mental, even those that are not considered "severe." *Id.* § 404.1545(a)(2), (b), (c). Mental limitations must be part of the RFC assessment, because "[a] limited ability to carry out certain mental activities, such as limitations in understanding, remembering, and carrying out instructions, and in responding appropriately to supervision, co-workers, and work pressures in a work setting, may reduce [a claimant's] ability to do past work and other work." *Id.* § 404.1545(c).

In explaining the basis for the RFC, the ALJ first listed Craft's alleged symptoms and limitations. She discussed Craft's daily activities and Hedemark's testimony. As is relevant to the mental analysis, the ALJ stated that Craft and Hedemark testified about Craft's memory loss. The ALJ stated that Hedemark also testified that Craft had mood swings and would go into rages "when his diabetes [was] high." The ALJ then recited some of Craft's medical history.

With respect to possible mental limitations, the ALJ noted that treating physician Dr. Rodriguez had found

Craft to have mild limitations in activities of daily living,
social functioning, and concentration, persistence, and
pace. The ALJ noted that Dr. Frey's psychiatric examina-
tion found Craft to be mildly depressed, frustrated, and
helpless, and that Craft believed it was due to his diabetes
and his inability to pay for medication. Dr. Frey also
noted that Craft's memory was within normal limits, and
he diagnosed Craft with dysthymic disorder. The ALJ
noted that Dr. Dang's psychiatric examination reported
that Craft's mood was depressed, he appeared tired, and
he had a problem with concentration. Dr. Dang diagnosed
Craft with dysthymia and assigned a global assessment of
functioning ("GAF") of 50.[7] Finally, the ALJ noted that
treating physician Dr. Escalona diagnosed him with
depression and also stated that he suffered from mood
swings.

The ALJ concluded that Craft's RFC was:

> a full range of light work, which involves lifting no
> more than 20 pounds at a time with frequent lifting
> or carrying of objects weighing up to 10 pounds, except
> that he can only walk occasionally, cannot climb, and
> cannot perform more than simple, unskilled tasks. The
> limitation to simple, unskilled task[s] is based on the

---

[7] The GAF scale reports a clinician's assessment of the individ-
ual's overall level of functioning. *Sims v. Barnhart*, 309 F.3d 424,
427 n.5 (7th Cir. 2002). A GAF of 50 indicates serious symptoms
or functional limitations. *American Psychiatric Association,
Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed.
1994).

claimant's history of dysthymia and complaints of
ongoing fatigue due to an inability to sleep well.

Based upon the VE's opinion that Craft's previous jobs
required a medium to very heavy level of exertion, the
ALJ concluded that Craft could not perform past relevant
work. The ALJ asked the VE the following hypothetical
for a claimant aged 39-44 with Craft's prior work experi-
ence: "can lift up to 20 pounds occasionally, 10 pounds
frequently. Sit, stand, or walk as required. Can occasionally
walk. Cannot climb. Can perform simple unskilled tasks,
which by definition can be detailed but not require a lot
of variables to them." The VE concluded that the
claimant could perform work as a hand packager and
assembly line worker, of which there were 15,000
positions in the Chicago area, and the ALJ ultimately
adopted this finding in her decision. The ALJ asked the
VE additional hypotheticals with varying physical limita-
tions, but no mental limitations were added.

The ALJ's mental RFC analysis is troubling in several
respects. Most significantly, the ALJ's RFC and the
hypotheticals given to the VE ostensibly accounted for
Craft's mental impairments by limiting him to simple,
unskilled work. However, the Social Security Administra-
tion has explained: "[b]ecause response to the demands of
work is highly individualized, the skill level of a position
is not necessarily related to the difficulty an individual will
have in meeting the demands of the job. A claimant's
[mental] condition may make performance of an unskilled
job as difficult as an objectively more demanding job." SSR
85-15.

The government directs our attention to *Johanson v. Barnhart*, 314 F.3d 283, 289 (7th Cir. 2002), in which the ALJ adopted a medical opinion where a doctor had "translated" the checkmarks on a mental RFC assessment form into a suggested RFC that the claimant could engage in repetitive, low-stress work. Here, the only doctor to fill out a mental RFC assessment checklist was Dr. Tomassetti, whose opinion the ALJ never mentioned. Dr. Tomassetti placed checkmarks in boxes to indicate that Craft had moderate and slight limitations in several areas, and the narrative portion of the form "translated" that Craft had the ability to understand and recall instructions, his mood moderately interfered with his concentration and pace, and he enjoyed people but had a difficult time controlling his temper. In *Johanson*, the RFC reflected some work requirements that were relevant to mental abilities (i.e., repetition and stress); here, the RFC was for "unskilled" work, which by itself does not provide any information about Craft's mental condition or abilities. The Social Security Administration has stated that where the claimant has the ability to understand, carry out, and remember simple instructions; respond appropriately to supervision, coworkers, and usual work situations; and deal with changes in a routine work setting, then an RFC of "unskilled" work would be appropriate. *See* 20 C.F.R. § 404.1545(c); SSR 85-15.

Here, the use of the term "unskilled" is unhelpful because we cannot discern whether the ALJ actually found Craft to have those abilities. Most of the ALJ's discussion of Craft's medical history is merely a recitation of information contained in his medical records. The

ALJ implicitly found that Dr. Rodriguez's opinion deserved less weight, and she explicitly found that two non-examining state agents' opinions should be accorded some weight (only one was a psychiatric assessment, by Dr. Frey). The rest of the medical opinions were recited without a determination of weight; therefore, we cannot determine the significance of Dr. Dang's opinion, and, as noted previously, Dr. Tomassetti's opinion was never mentioned at all. All three psychiatric assessments (by Dr. Frey, Dr. Dang, and Dr. Tomassetti) indicate that Craft had some level of difficulty with memory, concentration, or mood swings. We conclude that the there is not an "accurate and logical bridge" between the ALJ's recitation of the mental medical evidence and the decision to account for Craft's mental impairments by limiting him to unskilled work.

Although the ALJ is not required to mention every piece of evidence, we note for future reference some of the unmentioned mental evidence that seemed particularly critical to the mental RFC analysis. Dr. Tomassetti found Craft to be moderately limited in two of the B Criteria (social functioning and concentration, persistence, or pace), as well as moderately limited in the ability to understand, remember, and carry out detailed instructions, the ability to maintain attention and concentration for extended periods, the ability to complete a normal work-day without interruptions from psychologically based symptoms, and the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes. The ALJ certainly is entitled to give non-examining psychiatrist Dr. Tomassetti's opinion whatever

weight that it is due; however, the failure to mention this detailed mental assessment is cause for concern. The ALJ also failed to note that Dr. Frey's evaluation mentioned that Craft's mental functioning had "been reduced 80-90%." Although this statement seems inconsistent with some of Dr. Frey's other conclusions about Craft, we cannot tell whether the ALJ considered and rejected this piece of evidence because she did not mention it. Finally, the ALJ discussed Dr. Dang's evaluation but failed to mention any of the moderate and slight mental limitations that Dr. Dang found Craft to possess.

## B. Physical Limitations

Craft also asserts that the ALJ erred in assessing his physical limitations because of a negative credibility finding. An ALJ is in the best position to determine the credibility of witnesses, and we review that determination deferentially. *Sims v. Barnhart*, 442 F.3d 536, 538 (7th Cir. 2006). We overturn a credibility determination only if it is patently wrong. *Prochaska v. Barnhart*, 454 F.3d 731, 738 (7th Cir. 2006). The determination of credibility must contain specific reasons for the credibility finding. *Arnold v. Barnhart*, 473 F.3d 816, 822 (7th Cir. 2007) (citing SSR 96-7p). The finding must be supported by the evidence and must be specific enough to enable the claimant and a reviewing body to understand the reasoning. *Id.* Where the credibility determination is based upon objective factors rather than subjective considerations, we have greater freedom to review the ALJ's decision. *Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000) (quoting *Herron v. Shalala*, 19 F.3d 329, 335 (7th Cir. 1994)).

An ALJ must consider a claimant's subjective complaints of pain if the claimant has a medically determined impairment that could reasonably be expected to produce that pain. 20 C.F.R. § 404.1529(c)(1). Here, the ALJ determined that the objective medical evidence did not provide strong support for Craft's claimed symptoms and limitations. The ALJ's conclusion that Craft's complaints were not supported by the medical evidence was based upon three considerations.

First, the ALJ found that Craft's complaints were not entirely credible because he "did not seek any treatment from 1998 to 2001." While reciting Craft's medical history, the ALJ acknowledged that Craft was treated several times during 1998 and 2001—which left only 1999 and 2000 without treatment. The ALJ failed to note, however, that Craft was also treated on September 28, 2000. The government asserts that this was harmless error because the doctor's report from the visit in 2000 did not contain any information of substance, and it still demonstrates Craft's "dearth of treatment" during that time period. Several of Craft's medical records noted, however, that Craft had been out of compliance with his medicine and did not seek regular treatment because of his inability to cover the associated costs. In assessing credibility, infrequent treatment or failure to follow a treatment plan can support an adverse credibility finding where the claimant does not have a good reason for the failure or infrequency of treatment. SSR 96-7p. However, the ALJ "must not draw any inferences" about a claimant's condition from this failure unless the ALJ has explored the claimant's explanations as to the lack of medical care. *Id.* An inability to

afford treatment is one reason that can "provide insight into the individual's credibility." *Id.* Here, although the ALJ drew a negative inference as to Craft's credibility from his lack of medical care, she neither questioned him about his lack of treatment or medicine noncompliance during that period, nor did she note that a number of medical records reflected that Craft had reported an inability to pay for regular treatment and medicine.

Second, the ALJ claimed in her written decision that Craft had "a litany of complaints that were not noted in the treatment records until the day after the hearing. . . . Specifically, the claimant was asked at the hearing if he had ever addressed the various complaints to his doctors and he said he raised them every time. . . . [This] does not enhance his credibility." This statement by the ALJ is completely without foundation.

Craft's complaints at the hearing included: pain and tingling in his legs (his left leg had been bothering him for a few years and his right leg began to bother him in June 2002), knee pain, open sores on his ankles and calves, pain and tingling in his left arm, pain and tingling in his upper back, a lack of energy, sleeping during the day because of pain at night, loss of teeth, weight loss, and memory loss. The ALJ asked Craft to estimate when he first talked to a doctor about his neuropathy. The ALJ also asked Craft what his doctor said about the open sores. The ALJ did not ask Craft about reporting any of his other complaints to his doctors—the only reference Craft made to complaining to his doctors "every time" was in reference to the question about neuropathy, and his answer was consistent with the medical records.

Further, the medical records show that Craft raised these complaints long before the hearing with the ALJ. The hearing with the ALJ was on October 7, 2003. Craft's medical records note complaints of pain or numbness as early as October 11, 2001, and it is subsequently noted at nearly every visit during 2002 and 2003. He complained of memory loss in 2001 and 2002. He complained of vision problems in 2001, 2002, and May 2003. He complained of a lack of energy in 2001. He complained of weight loss in 2001. He complained of sores on his legs in July 2003. He complained of being unable to sleep at night in 2002 and May 2003. The record simply does not reflect the ALJ's contention that Craft raised a "litany of complaints" at the hearing without first complaining of them to his doctors. Not only did Craft complain about these ailments, but the doctors often made relevant diagnoses. Craft was repeatedly diagnosed with neuropathy with symptoms in his legs and left arm, and he was regularly prescribed medication for it. Craft's records also indicate diagnoses of early retinopathy or vision loss on several occasions. The only complaints not evident in the medical records were loss of teeth and back pain.

The credibility determination affected the ALJ's findings as to the extent of Craft's limitations, which directly impacted the outcome at step five. The ALJ asked the VE more restrictive hypotheticals based upon some of Craft's physical complaints, which the ALJ did not ultimately adopt. The VE testified that if Craft were limited to occasional use of his left hand, then work would be precluded. The VE also testified that if Craft were re-

quired to lie down during the workday outside of normal break times, then work would be precluded. Because two of the three reasons the ALJ listed for finding Craft incredible are contradicted by the objective evidence, we conclude that the credibility determination was patently wrong, and the error cannot be deemed harmless.

In light of the remand, we make one additional note with respect to the ALJ's third reason for finding Craft incredible. An ALJ can appropriately consider a claimant's daily activities when assessing his alleged symptoms. *See* 20 C.F.R. § 404.1529. However, "[w]e have cautioned the Social Security Administration against placing undue weight on a claimant's household activities in assessing the claimant's ability to hold a job outside the home." *Mendez v. Barnhart*, 439 F.3d 360, 362 (7th Cir. 2006). Here, the ALJ questioned Craft about his ability to prepare meals, make his bed, clean his apartment, take walks, and shop for groceries. The ALJ concluded that Craft's activities "belie his assertion of incapacity." The ALJ ignored Craft's qualifications as to *how* he carried out those activities: Craft's so-called "daily walk" was merely to the mailbox at the end of the driveway, his vacuuming took only four minutes, and his grocery shopping was done on a motorized cart at the store and he was able to carry only one grocery bag in each hand into the house. Each activity left him exhausted. Unless the ALJ properly finds Craft's testimony to be incredible on remand, any such testimony about how Craft copes with his daily activities should be considered in the RFC assessment.

### C. VE Testimony

For completeness, we also address Craft's final argument, that the VE's testimony conflicted with the jobs she cited from the *Dictionary of Occupational Titles* ("DOT") and was unsupported because she was unable to substantiate her testimony on demand.

Craft contends that the VE chose two occupational categories containing 103 jobs and was unable to provide the occupational codes for those jobs. Without the occupational codes, Craft's counsel was prevented from exploring whether Craft could truly perform any of those jobs with the limitations that he had. We agree with the district court's conclusion that Craft's counsel did not sufficiently challenge the VE's testimony. Counsel asked whether the VE had the "DOT code here with you today?" The VE responded: "The actual Dictionary of . . . publication?" to which counsel responded affirmatively. The VE replied that she keeps copies of a range of DOT titles with her throughout the day as she attends hearings. Craft's counsel then asked what the VE was reading from when she gave her opinion to the ALJ, and she replied that she was reading from notes she took while the ALJ was talking. Craft now explains that counsel was asking for the occupational codes, not the DOT itself, and argues that the VE's reply that she was reading from notes taken while the ALJ was speaking demonstrates that her testimony was without foundation. Even if counsel was asking for the occupational codes, it does not appear that the VE understood the request. Counsel's oblique references to the VE bringing the code and reading

from her notes did nothing to inform the ALJ or VE that counsel's ability to challenge the job requirements was hampered by not knowing which particular jobs were included in the broad categories of hand packager or assembly line worker.

When a VE provides evidence about the requirements of a job or occupation, the ALJ has an affirmative duty to ask about potential conflicts between that evidence and the DOT. *Prochaska*, 454 F.3d at 735; SSR 00-4p. The ALJ must obtain a reasonable explanation for any apparent conflict. *Prochaska*, 454 F.3d at 735; SSR 00-4p. In *Prochaska*, the claimant contended that each job in the occupational categories identified by the VE would require her to stoop or reach above the shoulder level, which the ALJ found that she could not do. On appeal, we could not determine whether the requirements of bending or stooping were actually inconsistent with the DOT, but we stated that there was an "unresolved potential inconsistency" which should have been explored by the ALJ. *Prochaska*, 454 F.3d at 736.

Here, the ALJ asked whether the characteristics of the jobs were consistent with the DOT, and the VE responded that they were. However, the VE had previously volunteered that the hypothetical's requirement of a position that allowed for occasional walking would preclude some, but not all, of the job titles she had identified. On remand, the ALJ should further explore any potential conflicts between the VE's testimony and the DOT to ensure that the jobs' requirements are consistent with Craft's abilities.

### III. Conclusion

Because the ALJ erred in assessing Craft's mental and physical limitations, we REVERSE the judgment of the district court and REMAND for proceedings consistent with this opinion.