NONPRECEDENTIAL DISPOSITION

To be cited only in accordance with Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Submitted December 12, 2017[*]
Decided January 11, 2018

**Before**

WILLIAM J. BAUER, *Circuit Judge*

KENNETH F. RIPPLE, *Circuit Judge*

DIANE S. SYKES, *Circuit Judge*

No. 16-3675

| | |
|---|---|
| SARAH DAVIS, | Appeal from the United States District |
| *Plaintiff-Appellant,* | Court for the Northern District of Illinois, Eastern Division. |
| *v.* | |
| | No. 14 C 8513 |
| NANCY A. BERRYHILL, | |
| Acting Commissioner of Social Security, | Jeffrey T. Gilbert, |
| *Defendant-Appellee.* | *Magistrate Judge.* |

## O R D E R

An administrative law judge denied Sarah Davis's application for Disability Insurance Benefits after finding that, although she suffers from several impairments, she was not entirely credible about her symptoms and could still work as a customer service representative. Because the ALJ's decision was supported by substantial evidence, we affirm.

---

[*] The case was set for oral argument on December 12, but both parties waived their right to participate.

In March 2012, Davis, then 55 years old, resigned from her job as a customer service representative at a bank—a job she held for over twelve years—because she could not make it through the workday without experiencing intense pain, stiffness, and trouble breathing. Although Davis's list of chronic health problems is long (sarcoidosis, diabetes, hypertension, myocardial bridge, sleep apnea, and asthma), she was able to manage these conditions for many years before resigning. But in 2010, Davis's health started to deteriorate. She began experiencing sharp chest pain. In April 2011 she started to have trouble breathing. Her primary-care doctor thought her chest pain and trouble breathing were part of a mild flare-up of an inflammatory disease known as sarcoidosis, which did not require medication, and her pulmonologist concluded that her condition was stable.

But in the summer of 2011 Davis also started experiencing back pain. In July she underwent an MRI that revealed mild to moderate cervical spondylosis. An X-ray of her lumbar spine returned findings of mild arthritis. Two weeks later she told her doctor that physical therapy had helped. Around this same time, she returned to the hospital for recurring chest pain. She has a heart condition known as myocardial bridge, but the hospital doctor concluded that this condition was not causing her pain—instead it was probably non-cardiac in nature.

In January 2012, Davis's health problems worsened after several people in her life died. She reported having trouble eating and monitoring her blood sugar. Three weeks later, Davis's doctor sent her to the hospital for an evaluation of her low blood sugar and chest pain. Her cardiac evaluation showed slight abnormalities, but the doctors did not recommend a full workup. By February, her chest pain was improving. Her primary-care doctor found that her blood sugar levels had stabilized.

During this period, although Davis complained of trouble breathing, she also reported some improvements in her general health. Her cardiologist opined in February 2012 that her asthma diagnosis was not certain because she rarely used her inhaler or any other medical treatment to control her symptoms. A couple of months later she went for a routine up visit and reported having no concerns or complaints, and her doctor found that her hypertension, high cholesterol, and diabetes were stable.

Davis applied for Disability Insurance Benefits in February 2012 and was denied initially and on reconsideration. In connection with her application, two state-agency doctors reviewed the record and concluded that Davis was not as limited as she had claimed. The doctors found, without examining her, that her primary diagnoses were

degenerative disc disease, chronic obstructive pulmonary disease (COPD), and sarcoidosis. They noted that there was no treating-source opinion that included any work limitations. The doctors thought that, even though her medically determinable impairments required some limitations, she had fairly normal exams. They concluded that she could sit or stand for six hours in a workday. They also recommended some environmental limitations (such as avoiding exposure to extreme temperatures, humidity, and odors) and limits on climbing ramps and stairs because of her history of asthma, sarcoidosis, diabetes, and hypertension.

After the state-agency physicians' review, Davis was admitted to the hospital for body aches and pains. At the hospital, a rheumatologist evaluated her for fibromyalgia and prescribed Lyrica, a drug for managing fibromyalgia pain. At the same time, a neurological study revealed that she may have carpal tunnel syndrome.

Later, in the fall of 2012, Davis sought treatment for depression. She told the doctor that she was having troubling concentrating and sleeping, and that her stress level had increased because of her husband's recent job loss.

At the hearing before an ALJ in January 2013, Davis said that she quit her job because of chest pain, difficulty breathing, and body stiffness and pain. She explained that she had to rest a lot, had trouble sleeping through the night, had difficulty driving because her hands ached, and, at her worst, was in so much pain that she stayed in bed all day. She said that she could lift eight to ten pounds, take care of her personal hygiene, remember to take her medication, and go to church "most Sundays." Davis also explained her possible fibromyalgia diagnosis, but told the ALJ that she had stopped using Lyrica because it was making her hallucinate. She said she lost her health insurance in August 2012 and thus had not received further treatment for fibromyalgia or her chest pain, but that she was receiving free care at a clinic for her other conditions.

The ALJ asked a vocational expert to consider whether a person of Davis's age and experience could perform her past work assuming the following limitations: that she could lift and carry twenty pounds occasionally and ten pounds frequently; could stand and walk six hours and sit for six hours in an eight-hour workday; could sit continuously for a period of 30 minutes and stand or walk continuously for a period of one hour; could occasionally climb ramps and stairs and never climb ladders, ropes, or scaffolds; could occasionally stoop and crouch; could not work with hazardous machines or in high exposed places; and should avoid exposure to extreme temperatures, wetness, humidity, and pulmonary irritants. The ALJ also asked the VE

to consider whether this person could work at the sedentary or light exertional levels. The VE said that this person could perform Davis's last job as she had described it (sedentary), but not according to the Dictionary of Occupational Titles, which categorizes the job as requiring light exertion.

The ALJ applied the five-step analysis found in 20 C.F.R. § 404.1520(a)(4) and found that Davis was not disabled. The ALJ determined at step one that Davis had not engaged in substantial gainful activity since her alleged onset in January 2012. At step two, the ALJ found, her degenerative disc disease, sarcoidosis, sleep apnea, COPD and asthma, hypertension, diabetes mellitus and myocardial bridge were severe impairments; her depression, however, was non-severe. At step three, the ALJ found that these impairments did not equal a listed impairment. At step four, the ALJ found that Davis had the residual functional capacity (RFC) to perform light work, with the additional limitations of only occasionally lifting twenty pounds, avoiding concentrated exposure to extreme temperatures, wetness, humidity, and pulmonary irritants, and never working with hazardous machines or in high, exposed places. The ALJ also found that Davis could perform her past job as a customer service representative.

The ALJ also concluded that Davis was "not entirely credible." First the ALJ reasoned that Davis could not be as limited as she claimed because the medical evidence suggested that her conditions were well controlled. The ALJ also found Davis's testimony inconsistent because she had argued that her loss of health insurance explained her lack of evidence regarding medical treatment, yet she had received some medical care after she quit her job.

The Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner. *See Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015). A magistrate judge, presiding by consent, *see* 28 U.S.C. § 636(c)(1), upheld the ALJ's decision. The judge emphasized that he independently conducted a critical review of the evidence, which he found sufficient to support the ALJ's analysis.

Davis first argues that the ALJ made two errors in assessing her depression at step one. She argues that the ALJ improperly applied the "special technique" in 20 C.F.R. § 404.1520a to assess the severity of her depression and, second, that the ALJ wrongly concluded that her depression was not severe because it had not and likely would not last for at least twelve months, *see* 20 C.F.R. § 404.1520(a)(4)(ii). The special technique requires an ALJ first to evaluate the claimant's symptoms (step A), and, if the ALJ finds those symptoms to amount to a medically-determinable impairment, then to

rate the degree of limitation that the claimant experiences across four areas: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation (step B). Id. § 404.1520a(b)(1)–(c)(3). Davis says that the ALJ failed to perform the first step (step A), but it is clear from the ALJ's decision that she evaluated both Davis's testimony and the record evidence of her sleep issues, depressed mood, and fatigue. Because the ALJ "discussed [Davis's] mental medical history," she properly performed step A. *See Craft v. Astrue*, 539 F.3d 668, 675 (7th Cir. 2008).

Second, Davis contends that the ALJ erred by concluding that her depression was not severe because it did not meet the requirement that her medically determinable impairment (or combination of impairments) must have lasted or be expected to last for at least twelve months. *See* 20 C.F.R. § 404.1520(a)(4)(ii). Davis has a point: a finding of duration says nothing about severity; and severity, as she points out, must be assessed using the special technique. *See Craft*, 539 F.3d at 674.

But as Davis appears to acknowledge, the ALJ ultimately applied the special technique to determine the severity of Davis's depression. In her analysis, the ALJ considered the four broad functional areas (activities of daily living; social functioning; concentration, persistence, and pace; and episodes of decompensation). Because the ALJ found that Davis had only mild limitations in these areas, and had experienced no episodes of decompensation, she concluded that Davis's depression was non-severe, *see* 20 C.F.R. § 404.1520a(b)(1)–(c)(3). This was a proper application of the special technique. *See Craft*, 539 F.3d at 674–75. The ALJ's conclusion was not influenced by the first, erroneous statement, so any error was harmless.

Davis challenges the ALJ's determination at step two that none of her impairments met or equaled a listing. First she argues that the ALJ must have erred in her listing analysis because she relied on the opinions of the state–agency doctors, who did not refer to any specific listing. But there is no law or regulation requiring state–agency doctors to identify the listings they considered. Next, Davis argues that the ALJ did not analyze whether her conditions were equivalent to any listing. But the ALJ specified that she was relying on the state-agency doctors' findings on equivalence, an explanation that we have deemed acceptable. *See Scheck v. Barnhart*, 357 F.3d 697, 700–701 (7th Cir. 2004). Finally, Davis argues that the ALJ should not have given significant weight to the state-agency doctors' opinions that none of her impairments met a listing because their assessments were not thorough. But the state–agency doctors' opinions are the only evidence in the record on the issue; "the opinions of [Davis's] treating physicians simply did not address" medical equivalency of her

conditions to a listing. *Scheck*, 357 F.3d at 701 (quoting *Steward v. Bowen*, 858 F.2d 1295, 1299 (7th Cir. 1988)).

Davis raises three challenges to the ALJ's RFC assessment at step four that she could perform light work with some limitations. First, Davis contends that the ALJ's RFC analysis was inadequate because she merely summarized the medical evidence and thus did not create a "logical bridge" between the evidence and her conclusions. But the ALJ considered each of Davis's medical impairments and appropriately grounded her conclusions in medical evidence from the record. To the extent that Davis reprises her argument that the ALJ wrongly reached these conclusions by relying on the state–agency doctors' opinions, that argument lacks merit because there is "no doctor's opinion contained in the record which indicated greater limitations than those found by the ALJ." *Rice v. Barnhart*, 384 F.3d 363, 370 (7th Cir. 2004). Second, Davis argues that the ALJ erred in formulating the RFC because she did not include a limitation allowing Davis to take breaks to eat during the day because of her diabetes. But no doctor recommended that she do this. Davis seems to acknowledge that such a limitation may not be a necessity; she says only that needing to eat during the day "could be a factor in a[] [diabetic] individual's ability to work." (Appellant's Br. at 26).

Davis also argues that the ALJ erred by not including any limitations regarding fibromyalgia in the RFC, but Davis waived this challenge by not developing it in her brief. She does not explain how the ALJ's RFC finding is incompatible with her fibromyalgia symptoms, nor does she suggest what limitations should have been included. *See Gentle v. Barnhart*, 430 F.3d 865, 868 (7th Cir. 2005) (explaining that a diagnosed medical condition does not necessarily establish decreased capacity to work). Waiver aside, Davis supplied insufficient evidence to compel the ALJ to consider her fibromyalgia. The record includes only one set of hospital discharge notes commenting on a possible, but not yet established, diagnosis. *Cf. Thomas v. Colvin*, 826 F.3d 953, 959–60 (7th Cir. 2016) (ALJ should have considered claimant's fibromyalgia, diagnosed after state-agency doctors reviewed the record, because evidence included many reports of symptoms).

Last, Davis generally asserts that the ALJ's credibility determination was marred by bias that the ALJ maintained against her. Davis adds that the ALJ incorrectly faulted her for not having gotten a breathing test despite her lack of health insurance, because she did manage to receive other medical care after she quit her job. Davis says that the ALJ should have asked her for an explanation before discrediting her. *See Roddy v. Astrue*, 705 F.3d 631, 637 (7th Cir. 2013).

Davis's argument that the ALJ showed "animus" against her is wholly underdeveloped, without a single citation to legal authority. As for her second argument, it appears that the ALJ did not ask Davis why she did not undergo the breathing test at the hearing, even though the agency requires ALJs to ask claimants why they did not seek treatment before drawing any adverse inferences. SSR 96–7p, 1996 WL 374186, at *8. But the ALJ thoroughly justified the credibility determination by highlighting many inconsistences that Davis does not meaningfully challenge.

AFFIRMED.