NONPRECEDENTIAL DISPOSITION

To be cited only in accordance with Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued February 28, 2018
Decided May 4, 2018

**Before**

DANIEL A. MANION, *Circuit Judge*

DIANE S. SYKES, *Circuit Judge*

DAVID F. HAMILTON, *Circuit Judge*

No. 17-2284

| | |
|---|---|
| GLENN H. HUBER, JR., | Appeal from the United States District |
| *Plaintiff-Appellant*, | Court for the Southern District of Indiana, |
| | Indianapolis Division. |
| *v.* | |
| | No. 16-cv-1947 |
| NANCY A. BERRYHILL, | |
| Deputy Commissioner for Operations, | Matthew P. Brookman, |
| Social Security Administration, | *Magistrate Judge*. |
| *Defendant-Appellee*. | |

**O R D E R**

Glenn Huber, a 67-year old veteran who suffers from knee and hip pain, arthritis in his spine, and poor hearing, appeals the district court's judgment upholding the denial of his application for disability insurance benefits. An administrative law judge found that, despite his impairments, he had the residual functional capacity to perform light work. Huber challenges the adequacy of the ALJ's RFC finding. Because the ALJ overlooked relevant medical evidence regarding Huber's abilities to walk, stand, and hear and made a patently wrong credibility finding when assessing his symptoms, we reverse and remand.

## I. Background

Huber applied in 2013 for disability insurance benefits based on his spinal arthritis, hip and knee pain, and impaired hearing—ailments that, he said, rendered him unable to work beginning in the spring of 2011. Huber, who served in the military and completed one year of college, previously worked as an insurance agent (1994–2010) and as an auditor for a federally funded weatherization program (2010–2011).

Huber's relevant medical records date back to 2010, when he was examined at a Veterans Administration hospital for complaints related to his hips, knees, and hearing. At his appointment, Huber complained to an orthopedic surgeon of hip and knee pain that he said was "getting worse." The surgeon diagnosed him with degenerative joint disease in his knees and inflammation in his hips (trochanter bursitis). Huber then saw a VA audiologist, who determined Huber to have "moderately-severe to profound" hearing loss for high-frequency sounds that, he wrote, would have "[s]ignificant effects" on his ability to work. The audiologist reported that Huber said he had tinnitus that made it difficult for him to hear in crowds, concentrate, and sleep.

Huber's spinal problems were first documented in 2011. In mid-2011, a doctor specializing in pain medicine diagnosed him with a fracture in his vertebrae and performed a procedure to reduce his back pain and restore his spine's alignment (kyphoplasty surgery). Five months later, radiologists x-rayed Huber's spine and concluded that he had degenerative disc disease in the cervical, thoracic, and lumbar areas of his spine. In late-2011 and early-2012, pain specialists administered anesthetic injections into his lumbar spine to reduce his back pain. Still experiencing "chronic low back pain" one month later, Huber underwent radiofrequency ablation, which sought to reduce pain in his lumbar spine by using an electrical current to heat nerve tissue in this part of his back.

Roughly fourteen months later, Huber told a state consultative examiner of his "difficulty with standing, sitting or walking, bending over or lifting." The examiner observed that Huber could bend his lumbar spine fully forward but that "it was painful" and noted that he had chronic hip, knee, and back pain. In the medical report for this visit, the examiner wrote under the heading "Medical Source Statement" that Huber "has difficulty with standing, walking, bending over and lifting."

In August 2013, a VA physiatrist (a physical medicine and rehabilitation physician) performed electromyography to examine the muscles and nerves in Huber's legs. According to the physiatrist, the results of this procedure showed damage to a nerve providing movement and sensation in his right leg (right peroneal motor neuropathy) and to a nerve in his right calf (mild, right sural sensory neuropathy).

Around this time, two state agency doctors weighed in on Huber's functional limitations, and Huber's wife provided a report on his daily activities. The doctors opined that Huber could perform a range of light work involving walking and/or standing for six hours per day. Meanwhile Huber's wife said that her husband could "walk around the house," but "[o]ther movements" and "staying in one position for a long time cause him a lot of pain." She added that it took him longer than normal to do "all chores," including laundry and cleaning the bathroom.

At his hearing before an administrative law judge in 2014, Huber asserted that back, knee, and hip pain and hearing problems prevented him from working. He reported that his medical treatment was "not resolving the [pain] issue," and therefore he could sit for only "about 30 minutes," stand for "about 10 minutes," and walk for 5 to 10 minutes before experiencing pain and/or cramping. He further testified that because of his "hearing problems," his friends "abandoned [him], for the simple reason that they got tired of me asking them, 'What did you say?'"

The ALJ asked a vocational expert to consider the possible employment opportunities for a person of Huber's age, education, and vocational background who could only occasionally climb ladders, ropes, scaffolds, ramps, and stairs, and must only occasionally stoop, balance, crouch, crawl, kneel, and be exposed to hazardous conditions. The vocational expert said that this person could perform Huber's past job as an insurance agent, but not his last position as a weatherization auditor.

The ALJ applied the five-step analysis in 20 C.F.R. § 404.1520(a)(4), and found Huber not disabled. The ALJ determined that he had not engaged in substantial gainful activity since the alleged onset date of April 15, 2011 (step one); that degenerative disc disease, degenerative joint disease in his hips and right knee, and hearing loss were severe impairments (step two); that these impairments did not equal a listed impairment (step three); that he had the residual functional capacity to perform light work, limited to workspaces with non-slippery surfaces, moderate exposure to noise, occasional climbing of stairs, ramps, scaffolds, ladders, and ropes, occasional balancing,

crouching, crawling, stooping, kneeling, and exposure to hazardous conditions; and that he could perform his past job as an insurance agent (step four).

In determining Huber's RFC, the ALJ found his testimony about the severity of his impairments "not entirely credible." The ALJ emphasized two reasons:

> First, allegedly limited daily activities cannot be objectively verified with any degree of certainty. Secondly, even if the claimant's daily activities are truly as limited as alleged, it is difficult to attribute that degree of limitation to the claimant's medical condition, as opposed to other reasons, in view of the relatively weak medical evidence and other factors discussed in this decision.

Noting that Huber was not prescribed narcotics "on a long-term basis" nor referred to a neurosurgeon, the ALJ also opined that "the conservative nature of said medications [and treatment] weighs against a finding of disability." As a final matter, the ALJ acknowledged Huber's hearing loss and complaints that he had trouble sitting, standing and walking, but concluded that "from a clinical perspective" he had insufficient medical evidence of significant impairments to show that he was disabled. The Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner. *See Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015).

Huber argued in the district court that the ALJ disregarded medical opinions of the consultative examiner and the audiologist. But a magistrate judge, presiding by consent, *see* 28 U.S.C. § 636(c)(1), upheld the ALJ's decision. In the magistrate judge's view, the ALJ did not err by failing to address the consultative examiner's statement that Huber "has difficulty with standing, walking" because the ALJ cited evidence from this doctor's report that supported this statement. Nor did the ALJ err by not evaluating the audiologist's statement that Huber's hearing deficits would "[s]ignificant[ly]" affect his ability to work because the ALJ cited the audiologist's report "as a basis for the RFC limitations he provided" and "no evidence suggests a greater limitation is required." The judge also ruled that the ALJ's credibility assessment was not patently wrong.

## II. Analysis

Huber argues that the ALJ committed three reversible errors.

### A. Consultative Examiner's Opinion

Huber first contends that in making his RFC assessment, the ALJ violated 20 C.F.R. § 404.1527(c) by failing to evaluate the consultative examiner's opinion that he "has difficulty with standing, walking, bending over and lifting."[1] He emphasizes that Social Security regulations define "light work" to "require[] a good deal of walking or standing," 20 C.F.R. § 404.1567(b), and asserts that before deciding that he could perform light work, the ALJ needed to confront the examiner's opinion.

Huber is correct that the ALJ violated § 404.1527(c) by not considering the consultative examiner's opinion that he had trouble standing and walking. *See Roddy v. Astrue*, 705 F.3d 631, 636, 639 (7th Cir. 2013) (remanding because ALJ did not address doctor's opinion that claimant couldn't work beyond six hours per day). Given that the ALJ concluded that Huber could do a good deal of walking or standing ("light work"), the ALJ needed to confront the contrary opinion of the agency's own examining physician before reaching this conclusion. "An ALJ . . . cannot simply cherry-pick facts that support a finding of non-disability while ignoring evidence that points to a disability finding." *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010).

The Commissioner argues that the consultative examiner's statement about Huber's abilities to stand and walk was not a medical judgment, and therefore the ALJ did not need to consider it. Because the examiner recorded this statement as one of Huber's complaints, the Commissioner contends that this statement "reasonably reflected Huber's own report of difficulties," not a medical opinion that the ALJ was required to evaluate. We reject this argument because the examiner repeated this statement in his report immediately under the heading, "Medical Source Statement," signaling that this statement was the examiner's opinion too. *See* SSR 96-5p, 1996 WL 374183, at *4 ("Medical source statements are medical opinions submitted by acceptable medical sources."). Alternatively, the Commissioner contends that this statement does not "clarify the extent to which the claimant could do those activities," and thus any error by the ALJ in not addressing it was harmless. But if the ALJ required clarification from the doctor consulted by his own agency about the extent of Huber's trouble walking and standing, then the ALJ needed to seek "additional information to flesh out" these details. *Barnett v. Barnhart*, 381 F.3d 664, 669 (7th Cir. 2004).

---

[1] The statement that Huber "has difficulty with standing . . ." first appears in a section of the examiner's report recounting Huber's self-described medical history and then is repeated almost verbatim under the heading "Medical Source Statement" at the end of the report.

### B. Audiologist's Medical Opinion and Huber's Conversational Limitations

Huber next argues that the ALJ again violated 20 C.F.R. § 404.1527(c) by failing to address the audiologist's statement that his hearing impairments would significantly affect his ability to work. He is correct that here too the ALJ violated § 404.1527(c) by not addressing this statement, and therefore we cannot be confident that the RFC accounts for all of Huber's limitations. We are not persuaded by the Commissioner's argument that the audiologist's statement "did not suggest problems in a normal office setting, and thus could not meet Huber's burden to prove an unreasonable RFC." The Commissioner wrongly interprets the audiologist's statement to reflect no medical judgment about Huber's ability to hear in an office environment. The audiologist's determination that Huber's hearing problems would significantly affect his ability to work, while somewhat vague, suggests that Huber would struggle to hear in an office environment and should have been addressed by the ALJ when deciding his RFC.

Huber also argues that the ALJ violated SSR 96-8p's requirement that he "consider all allegations of physical . . . limitations," 1996 WL 374184, at *5, by not addressing Huber's allegations of "conversational deficits stemming from tinnitus and sensorineural hearing loss." Huber is right that the ALJ did not mention these allegations anywhere in his opinion. On remand, the ALJ should assess them when revaluating his RFC.

### C. ALJ's Credibility Finding

Huber raises three challenges to the ALJ's determination that he "was not entirely credible." First he asserts that in deciding that he had "relatively weak medical evidence" of his ailments to support his contention of limited daily activities, the ALJ wrongly concluded that the record did not contain medical evidence of Huber having neurological deficits. He contends that the ALJ overlooked the electromyography results that revealed damage to nerves in Huber's right leg and right calf. He further argues that this error was not harmless because this evidence supported his allegations of hip and knee pain.

Huber is correct that the ALJ erred by ignoring the electromyography results and thereby reaching a credibility finding that, at least in part, was not "supported by the evidence." *Craft v. Astrue*, 539 F.3d 668, 678 (7th Cir. 2008). The Commissioner contends that the ALJ did not need to address this "trivial information" because Huber

"presented no evidence of symptoms stemming from neuropathy [and] . . . the ALJ accurately explained that Huber showed normal neurological functioning on all exams." But the ALJ needed to acknowledge the electromyography results because they contradict his conclusion that Huber never exhibited neurological deficits and support Huber's pain allegations that the ALJ found not entirely credible. *See id.* at 679 (medical evidence of "neuropathy with symptoms in his legs" bolstered claimant's allegation of leg pain).

Second Huber argues that when evaluating the degree of his asserted limitations, the ALJ erred by reasoning that his doctors' decisions not to prescribe him long-term narcotics or refer him to a neurosurgeon suggest that his treatment was "conservative" and "weigh[] against a finding of disability." Huber questions the ALJ's definition of conservative treatment, adding that the treatment he did receive was hardly conservative, and in fact should be considered "aggressive."

Huber is right that the ALJ unreasonably minimized the extent of his treatment. As an initial matter, the ALJ committed a "logical error" by "misinterpreting the significance" of his doctors' treatment recommendations. *Scrogham v. Colvin*, 765 F.3d 685, 701 (7th Cir. 2014). The absence of recommendations for back surgery or narcotics does not suggest that Huber's treatment was necessarily conservative. Further the ALJ omitted Huber's kyphoplasty surgery and radiofrequency ablation when recounting the "treatment regimen" that he characterized as conservative. The nature of these treatments bolsters Huber's pain allegations and suggests that the ALJ's basis for labeling his treatment conservative was "misguided." *Id.*

Third Huber points out that we have derided as "nonsensical" the sort of reasons relied upon by the ALJ here for discrediting his allegations of limited daily activities. *Thomas v. Colvin*, 534 Fed. App'x. 546, 551 (7th Cir. 2013). He argues that the ALJ here, as in *Thomas*, overlooked corroboration from a family member (his wife's report) when deciding that his "allegedly limited daily activities cannot be objectively verified." In addition Huber contends that similar to *Thomas*, the ALJ improperly concluded that his medical diagnoses were not enough to bolster the credibility of his assertion of limited daily activities. We agree with him that his diagnosed problems with his back and knee and hip pain reasonably explain his limited daily activities and that the ALJ ignored his wife's report stating that he performed all chores slower than he used to.

Because the ALJ disregarded relevant medical evidence and made a patently wrong credibility finding, we REVERSE the judgment of the district court and

REMAND for further proceedings. On remand the ALJ should fully address the consultative examiner's and audiologist's medical opinions, consider Huber's allegations of difficulty conversing, and reevaluate his credibility.