In the

# United States Court of Appeals
## For the Seventh Circuit

_____

No. 19-1870

MICHELLE JESKE,

*Plaintiff-Appellant,*

*v.*

ANDREW M. SAUL, Commissioner of Social Security,

*Defendant-Appellee.*

_____

Appeal from the United States District Court for the
Eastern District of Wisconsin.
No. 1:18-cv-00371 — **William C. Griesbach**, *Judge.*

_____

ARGUED DECEMBER 10, 2019 — DECIDED APRIL 2, 2020

_____

Before KANNE, SYKES, and BARRETT, *Circuit Judges.*

KANNE, *Circuit Judge.* On Halloween 2012, Michelle Jeske was working at a cemetery as a pallbearer and burial needs salesperson. She was carrying a heavy casket when she stumbled, injuring her back. About four years later, she applied for disability insurance benefits and supplemental security income based on disability; she claimed that back and spine problems, anxiety, depression, and suicidal tendencies made her unable to work.

The Commissioner of Social Security denied Jeske's requests, and, after a hearing, an administrative law judge ("ALJ") found Jeske not disabled under the Social Security Act, *see* 42 U.S.C. §§ 423(d), 1382c(3). Seeking judicial review, Jeske asked a federal district court to set aside the administrative decision. The court upheld the decision instead, and Jeske appealed. She argues that, for a handful of reasons, we should vacate and remand with instructions to return the case to the agency.

Because the ALJ's decision applies the proper standards, is supported by substantial evidence, and is sufficiently explained—and because Jeske waived one of her arguments—we affirm.

## I. BACKGROUND

At the hearing before the ALJ, Jeske confirmed that she was 44 years old and lived with her husband and three of her four sons, ages 11, 14, and 22. She also changed the date on which she allegedly became disabled—changing it from the date of her back injury (October 31, 2012) to more than a year later (January 1, 2014), because substantial gainful activity in 2013 showed that Jeske was not disabled that year. *See* 20 C.F.R. § 404.1520(b).

Jeske explained to the ALJ that she experiences constant back pain because of the casket-carrying incident. She elaborated that, after her injury, she received treatment through a workers' compensation program for a while. And during that time, Jeske's employer at the cemetery allowed her to work from home many days. But once the workers' compensation doctor released her from treatment, Jeske's boss no longer

permitted her to work from home. About a month later, Jeske believed she "couldn't do it anymore" and quit.

Since then, Jeske continued, she had worked part time as a security guard—a position that allowed her to walk, sit, stand, and lie down as she pleased, so long as she didn't fall asleep.

Jeske alleged that she cannot sit or stand for more than about 10 minutes at a time (or 20 minutes if driving) before back pain impels her to change positions. She described the pain as shooting "tweaks" that radiate through her back and sides, sometimes with back spasms and numbness in her legs and feet. She told the ALJ that "Workmen's Comp refused to do anything else and so now, even still to this day, it's just progressively getting worse and worse." Because of the back pain and psychological stress, she said, sleep comes to her in two-hour increments. She tries to alleviate the pain by shifting positions, walking around, and taking Ibuprofen, but even simple tasks seem difficult or impossible. She no longer participates in her sons' school activities, apart from picking them up from practice, and her husband and children help tremendously with the household chores, her personal hygiene, and shopping.

Along with Jeske's statements, the ALJ considered records of diagnostic imaging of her back, treatment providers' notes, and consulting doctors' evaluation reports, all following Jeske's injury in 2012.

The diagnostic images came from magnetic resonance imaging ("MRI") in 2012, a nuclear scan in 2013, and an x-ray in 2016. Doctors described the images as "negative," and "unremarkable," and interpreted them as indicating no more than

minimal or mild conditions, with no abnormal signals in the spinal cord detected.

The treatment notes came from Jeske's initial hospital visit the day of her injury, Jeske's sessions with the workers' compensation doctor and physical therapist who treated her, and an unrelated hospital visit in 2017.

The first hospital record noted that Jeske had driven herself to the hospital, described the level of pain in her back as a 6 out of 10, and denied experiencing any numbness or tingling. The attending doctor identified the problem as acute thoracolumbar strain and advised light duty for a week.

Dr. Sturm, who saw Jeske through her workers' compensation treatment, observed Jeske's condition improve over the six months following her injury. He also anticipated further improvement when he determined, in April 2013, that Jeske could work up to eight hours each work day, with no other restrictions. The physical therapist similarly observed that Jeske was improving, could benefit from continued physical therapy to progress further, was working full time, and rated her pain level as a 2 or 3 out of 10 on her last visit in March 2013.

After Jeske's release from workers' compensation, there is no record of treatment for her back. But the record from Jeske's unrelated hospital visit in 2017 indicated no motor deficits in all four extremities, normal sensory function, and a normal gait. And in 2016, doctors serving as consultants for the Social Security Administration evaluated Jeske and her medical records.

The doctor who conducted a physical exam in 2016 observed that Jeske appeared to struggle with some tasks, such

as tandem walking,[1] bending forward, squatting, and extending her legs. During the evaluation, Jeske also reported some loss of sensation and she demonstrated "give way" weakness on motor-strength testing of her legs. At the same time, she had a normal gait, symmetrical reflexes, and—apart from bending forward only 45 degrees instead of 90—normal range of motion in her spine.

The doctor who conducted a psychological exam in 2016 reported that Jeske appeared unkempt and seemed to struggle with depression and underlying trauma. Documenting a colloquy about how Jeske spends her days, the doctor wrote that, "[w]hen asked what she does on a typical day, she takes care of the kids and will try to relax and take care of herself to manage her pain. She does the cooking, cleaning, grocery shopping, and handles the money."

After considering the evidence, the ALJ found that Jeske could perform light work with specific limitations: she needed to be able to alternate between sitting and standing at will; she could not perform more than occasional stooping, crouching, kneeling, crawling, and climbing of ramps and stairs; she could not climb ladders, ropes, or scaffolding; and she was limited to unskilled work and jobs involving no more than occasional decision making, changes in the work setting, and interaction with others. The ALJ determined that, although Jeske could not perform her past work at the cemetery, she could adjust to other work that exists in substantial numbers in the national economy. So, the ALJ concluded, Jeske

---

[1] Tandem walking is walking in a straight line, placing the front foot so that its heel touches the toes of the standing foot. *See Murphy v. Colvin*, 759 F.3d 811, 818 (7th Cir. 2014).

was not disabled from January 1, 2014 through September 20, 2017.

Jeske contends the ALJ's assessment was improper in five ways, each requiring remand.

## II. ANALYSIS

The ALJ's conclusion that Jeske was not disabled closed the door on both Jeske's request for disability insurance and her request for supplemental security income. That's because the substantive standards governing whether a person is disabled are materially the same for both types of benefits. *See* 42 U.S.C. §§ 423(d), 1382c(3); 20 C.F.R. §§ 404.1520(a), 416.920(a); *Donahue v. Barnhart*, 279 F.3d 441, 443 (7th Cir. 2002).

We review the ALJ's "not disabled" decision directly, without deferring to the district court's assessment.[2] *Roddy v. Astrue*, 705 F.3d 631, 636 (7th Cir. 2013). We will uphold the ALJ's decision if it uses the correct legal standards, *id.*, is supported by substantial evidence, 42 U.S.C. § 405(g), and "build[s] an accurate and logical bridge from the evidence to [the ALJ's] conclusion," *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001). Substantial evidence is relevant evidence that a reasonable mind could accept as adequate to support a conclusion. *Craft v. Astrue*, 539 F.3d 668, 673 (7th Cir. 2008).

We review the entire record, but we do not replace the ALJ's judgment with our own by reconsidering facts, re-weighing or resolving conflicts in the evidence, or deciding questions of credibility. *Estok v. Apfel*, 152 F.3d 636, 638 (7th

---

[2] The Appeals Council denied review of the ALJ's decision, making it the Commissioner's final decision, 20 C.F.R. § 404.981, reviewable by a district court, 42 U.S.C. §§ 405(g), 1383(c)(3).

Cir. 1998). Our review is limited also to the ALJ's rationales; we do not uphold an ALJ's decision by giving it different ground to stand upon. *See SEC v. Chenery Corp.*, 318 U.S. 80, 93–95 (1943).

The ALJ here conducted the standard five-step evaluation process prescribed by the Social Security Administration for determining whether an individual is disabled. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a). At steps one and two, the ALJ found that (1) Jeske had not been doing substantial gainful activity since January 1, 2014, *see id.* § 404.1520(a)(4)(i), and (2) Jeske had three severe, medically determinable physical or mental impairments lasting at least twelve months: facet arthropathy of the lumbar spine;[3] depression; and post-traumatic stress disorder, *see id.* §§ 404.1520(a)(4)(ii), 404.1509.

Jeske's five claims of error begin at step three. She contends that (1) the ALJ's conclusion that Jeske was not presumptively disabled was both inadequately explained and incorrect; (2) the ALJ misrepresented and improperly relied upon Jeske's activities of daily living when deciding that she was not disabled; (3) the ALJ failed to discuss Dr. Sturm's opinion about Jeske's work hours; (4) the ALJ omitted a function-by-function assessment of Jeske's capacity to perform exertional tasks; and (5) the ALJ inadequately accounted for Jeske's limitations in concentration, persistence, and pace. We will take each argument in turn.

---

[3] In less-technical terms, arthritis in joints at the surfaces of bones in the lumbar spine. *See Facet*, *Dorland's Illustrated Medical Dictionary* 668 (32d ed. 2012) [hereinafter *Dorland's*]; *Arthropathy*, *id.* at 158.

### A. *Step-Three Listing Determination*

At step three, the ALJ must determine whether the claimant's impairments are "severe enough" to be presumptively disabling—that is, so severe that they prevent a person from doing any gainful activity and make further inquiry into whether the person can work unnecessary. 20 C.F.R. § 404.1525(a); *see Sullivan v. Zebley*, 493 U.S. 521, 532–33 (1990). An impairment is presumptively disabling if it is listed in the relevant regulations' appendix, *see* 20 C.F.R. § 404.1525(a), or if it is "medically equivalent" to a listing, *id.* § 404.1526(a). A medically-equivalent impairment has characteristics "at least of equal medical significance" to all the specified criteria in a listing. *Id.* § 404.1526(b); *cf. Zebley*, 493 U.S. at 530. When evaluating whether an impairment is presumptively disabling under a listing, the ALJ "must discuss the listing by name and offer more than a perfunctory analysis of the listing." *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004).

The listing at issue here is 1.04. It identifies as presumptively disabling "[d]isorders of the spine …, resulting in compromise of a nerve root … or the spinal cord."[4] 20 C.F.R. 404, Subpt. P, App. 1, § 1.04.

The listing captures spinal disorders that accompany "[e]vidence of nerve root compression characterized by" specific symptoms: "neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower

---

[4] Nerve roots are the lowermost parts of the nerves exiting the spinal cord. *See Root, Dorland's, supra* note 3, at 1653.

back, positive straight-leg raising test (sitting and supine)." *Id.* § 1.04A.

The listing also captures spinal arachnoiditis,[5] and lumbar spinal stenosis resulting in pseudoclaudication,[6] so long as the condition meets certain qualifications. *See id.* § 1.04B, C.

Spinal arachnoiditis must be "confirmed by an operative note or pathology report of tissue biopsy, or by appropriate medically acceptable imaging, manifested by severe burning or painful dysesthesia,[7] resulting in the need for changes in position or posture more than once every 2 hours." *Id.* § 1.04B.

Lumbar stenosis resulting in pseudoclaudication must be "established by findings on appropriate medically acceptable imaging, manifested by chronic nonradicular pain[8] and weakness, and resulting in inability to ambulate effectively, as defined in [another part of the appendix]." *Id.* § 1.04C.

---

[5] Spinal arachnoiditis is inflammation of the membrane that covers the spinal cord. *See Arachnoiditis, Dorland's, supra* note 3, at 123; *Arachnoid, id.* at 123; *Arachnoidea Mater, id.* at 123; *see also* 20 C.F.R. 404 Subpt. P, App. 1, § 1.00K.2.

[6] Lumbar spinal stenosis resulting in pseudoclaudication is the narrowing of the vertebral canal, nerve root canals, or space between vertebrae in the lumbar spine, caused by encroachment of bone upon the space, and resulting in limping or lameness accompanied by pain and abnormal sensations in the back, buttocks, and lower limbs. *See Claudication, Dorland's, supra* note 3, at 369; *Pseudoclaudication, id.* at 1541; *Stenosis, Spinal S., id.* at 1770; *see also* 20 C.F.R. 404 Subpt. P, App. 1, § 1.00K.3.

[7] Dysesthesia is distortion of any sense, especially touch. *Dysesthesia, Dorland's, supra* note 3, at 577.

[8] Nonradicular pain is pain not caused by disease of a sensory nerve root or roots. *See Pain, Radicular P., Root P., Dorland's, supra* note 3, at 1363.

Evaluating Jeske's spinal impairment under Listing 1.04, the ALJ determined that the impairment was not presumptively disabling. Jeske argues the ALJ's corresponding discussion was insufficient and incorrect.

The ALJ's initial discussion was certainly brief:

> The undersigned evaluated the claimant's spinal impairment under pertinent listing 1.04, but there is no evidence of nerve root compression characterized by neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss accompanied by sensory or reflex loss and positive straight-leg raising test (sitting and supine); spinal arachnoiditis; or lumbar spinal stenosis resulting in pseudoclaudication.

But the discussion picked up in the next part of the ALJ's decision. There, the ALJ addressed specific evidence of Jeske's symptoms and explained why he found Jeske's statements about her symptoms were not fully substantiated by the other evidence, which showed her symptoms were less severe.

For example, the ALJ reasoned that Jeske's injury had not prevented her from working full time, including 55-hour weeks, after it happened. The ALJ added that doctors interpreting Jeske's diagnostic images determined that the MRI in 2012 showed her facet arthropathy was "mild," and the nuclear scan in 2013 and the x-ray in 2016 returned images of Jeske's spine that were "unremarkable." Consistent with these interpretations, the ALJ observed, treatment providers determined that Jeske's spinal condition was not a surgical candidate and that Jeske consistently appeared functional with a normal gait and intact deep tendon reflexes. Also, Jeske's straight-leg raising tests were sometimes negative.

Continuing on, the ALJ recognized that the agency con-
sultant who evaluated Jeske in 2016 observed a normal gait
(albeit with some pain); full extension, full side lateral flexion,
and full rotation range of motion; and symmetrical reflexes.
Similarly, the ALJ reasoned, the medical record from June
2017 documented Jeske as having a normal gait, normal sen-
sation, and normal motor functioning.

Jeske protests that this discussion of the evidence appears
too late in the decision. Instead of appearing under the sub-
heading for step three, it appears between steps three and
four, with discussion of Jeske's residual functional capacity
("RFC"). Jeske acknowledges that we've found step-three dis-
cussion in a comparable place before. *See, e.g.*, *Curvin v. Col-
vin*, 778 F.3d 645, 650–51 (7th Cir. 2015). But she insists that
this practice necessarily violates the command of *SEC v.
Chenery Corp.*, that our judgment of the agency's decision
must rest only on the grounds upon which the agency's deci-
sion was based. 318 U.S. at 87–88. Jeske also reasons that the
ALJ's more thorough discussion of the evidence contradicts
his earlier statement that "there is no evidence of nerve root
compression," so the more thorough discussion couldn't have
been part of the ALJ's step-three determination. Finally, she
contends that the evidence compelled a finding that Jeske was
presumptively disabled under Listing 1.04A—the subpart ad-
dressing nerve root compression.

Turning to Jeske's first contention, we are not violating
*Chenery*'s command by looking at the ALJ's more thorough
discussion of the evidence. Observing that an ALJ placed
some of its step-three rationale with its discussion of a claim-
ant's RFC does not give the ALJ's step-three determination

new ground to stand upon. It simply identifies the ALJ's step-three rationale for review.

The five-step evaluation process comprises sequential determinations that can involve overlapping reasoning. *See* 20 C.F.R. § 404.1520(a)(4). This is certainly true of step three and the RFC determination that takes place between steps three and four: an impairment so severe that it is presumptively disabling will generally, if not always, leave the claimant without functional capacity to work—that's why the impairment triggers a presumption of disability in the first place. *See id.* § 404.1520(d)–(e). Accordingly, when an ALJ explains how the evidence reveals a claimant's functional capacity, that discussion may doubly explain how the evidence shows the claimant's impairment is not presumptively disabling under the pertinent listing. And, as we've already recognized, "[t]o require the ALJ to repeat such a discussion throughout [the] decision would be redundant." *Curvin*, 778 F.3d at 650.

Here, the evidence of Jeske's back condition and symptoms dictated whether her back impairment met the criteria of Listing 1.04. And the ALJ's more thorough discussion—although located with the discussion of Jeske's RFC—explained what the evidence revealed about Jeske's condition and symptoms. That more thorough discussion also elaborated the ALJ's initial statement. Jeske disagrees, contending that the ALJ's extended discussion conflicts with his earlier statement that there was no evidence of nerve root compression. But we do not see the two parts of the ALJ's discussion as incongruous.

The regulations make clear that a disorder under Listing 1.04 is evident only if all the listing's criteria are met. *See* 20 C.F.R. 404, Subpt. P, App. 1, § 1.04A, B, C. We thus read the

ALJ's initial statement as saying that the evidence did not show that Jeske met all the required criteria—not, as Jeske suggests, that there was no evidence she met *any* of the criteria.

Indeed, the ALJ observed evidence that Jeske exhibited some symptoms common to nerve root compression. For example, the ALJ recognized two positive straight-leg raising tests and signs that Jeske experienced reduced flexion and sensation alongside pain. Recall that nerve root compression is established by "neuro-anatomic distribution of pain, limitation of motion of the spine, motor loss (atrophy with associated muscle weakness or muscle weakness) accompanied by sensory or reflex loss and, if there is involvement of the lower back, positive straight-leg raising test (sitting and supine)." *Id.* § 1.04A.

The ALJ also recognized, however, that the evidence was not entirely consistent, that Jeske was not fully credible, and—ultimately—that the requirements for an impairment under Listing 1.04 had not been met. So, the ALJ did not give contradictory assessments of the evidence.

Finally, we turn to Jeske's argument that the evidence compelled a step-three decision opposite the ALJ's—because, she says, the evidence showed she was presumptively disabled under Listing 1.04A. Because Jeske does not contest the ALJ's decision that Jeske did not qualify for a presumption under 1.04B (spinal arachnoiditis) or 1.04C (lumbar spinal stenosis resulting in pseudoclaudication), our analysis will focus on 1.04A (nerve root compression). In the end, we conclude that substantial evidence supports the ALJ's step-three determination.

To start, no medical records or other reports mentioned nerve root compression, nor did any of them indicate that all the indicia of nerve root compression were present.

The diagnostic-imaging records, which the ALJ addressed, also support his determination that Jeske's impairment was not as severe as Jeske alleged. The MRI readings indicated minimal-to-no significant spinal canal stenosis; mild-to-no foraminal stenosis;[9] mild facet arthropathy; maintained vertebral heights; and no abnormal signals in the spinal cord. The nuclear scan returned "unremarkable" images of Jeske's lumbar spine, no abnormal uptake in the lumbar spine, and "unremarkable" soft tissue uptake. And the x-ray report in 2016—apparently part of the consultative exam—indicated "satisfactory" vertebral height and alignment and "adequately maintained" disc spaces, without mention of any abnormalities. These records underpin the ALJ's finding that Jeske's nerve roots and spinal cord were not compromised.

Adding to that support, the treatment notes and evaluation reports that the ALJ discussed consistently indicated that Jeske's gait was normal, even if accompanied by pain, and that she ambulated easily.

Next, as the ALJ noted, the evidence showed inconsistent straight-leg raising tests—some positive and some negative. And none of the records indicated whether the positive ones were positive in both sitting and supine positions, as Listing 1.04A requires.

---

[9] Foraminal stenosis is abnormal narrowing of the natural opening in a vertebra. *See Foramen*, *Dorland's*, *supra* note 3, at 729; *Stenosis*, *id.* at 1769.

The evidence the ALJ examined was also mixed on whether Jeske experienced limited motion of the spine and motor-strength loss accompanied by loss of sensation or reflexes.

Although the 2016 evaluation report documented less-than-normal flexion in Jeske's spine, it also documented normal extension, normal right and left lateral flexion, normal right and left rotation in the lumbar spine, symmetrical reflexes, and ability to walk normally. The ALJ observed this assortment of medical findings, as well as Dr. Sturm's notes reporting similar findings about Jeske's normal gait and station, and essentially normal range of motion.

As for motor-strength loss accompanied by loss of sensation or reflexes, Jeske exhibited "give way" on motor-strength testing of her legs in the 2016 evaluation, and Jeske said she experienced numbness. But the ALJ also determined that Jeske's portrayal of her symptoms was not entirely credible, and the ALJ was not required to find the "give way" demonstration was conclusive proof of weakness. *Cf. Simila v. Astrue*, 573 F.3d 503, 508, 518–19 (7th Cir. 2009) (explaining that "give way" results—which indicate less-than-full effort on strength testing—may not be reliable indications of muscle weakness and may be a sign of exaggerated symptoms). The ALJ also acknowledged Dr. Sturm's determination that by mid-January 2013, Jeske could lift, carry, push, and pull up to 40 pounds. And, as the ALJ noted, the doctors who saw Jeske consistently documented that her reflexes were intact, and the hospital record from 2017 indicated no motor deficits in all four extremities and normal sensory function.

So, although the evidence showed Jeske suffered from limiting back pain, abundant evidence supports the ALJ's

determination that her condition lacked all the requirements of a presumptively disabling impairment under Listing 1.04A. We therefore reject Jeske's first argument.

### B. *Jeske's Daily-Living Activities*

Next, Jeske argues that the ALJ both misrepresented and improperly relied upon Jeske's ability to perform activities of daily life.

Jeske points to two of the ALJ's statements, in particular. First, at step three, the ALJ wrote that Jeske "endorsed being capable of caring for her kids, managing money, and finishing what she starts (though she testified she does not finish what she starts)" and that she "reported not needing any special reminders to take care of her personal hygiene, caring for her children …, cooking cleaning, managing money, shopping, and driving." Second, between steps three and four, the ALJ reiterated that Jeske "reported rather good activities of daily living," as she "indicated not needing any special reminders to take care of her personal hygiene, caring for her children …, cooking, cleaning, managing money, shopping, and driving."

These are not mischaracterizations. Jeske gave varying accounts of her daily-living activities. In a functional report she submitted to the agency, she indicated that she takes care of her children, with the two adult children helping out. She also indicated that she does not need any special reminders to take care of personal needs and grooming, and she sometimes prepares her own meals. Similarly, the agency doctor who conducted a psychological evaluation in 2016 relayed: "When asked what she does on a typical day, she takes care of the kids and will try to relax and take care of herself to manage

her pain. She does the cooking, cleaning, grocery shopping, and handles the money."

The ALJ acknowledged that, at the hearing, Jeske indicated she was less capable, saying that her husband helps with her personal hygiene, at least one son always helps her pick up groceries, the kids do the vacuuming and dishes, and her husband does the laundry. But, also at the hearing, Jeske endorsed the ALJ's partial recapitulation of the functional report she had submitted to the agency, indicating her earlier description remained accurate.

It was the ALJ's responsibility to decide the facts and resolve discrepancies in these accounts. *See Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000). The ALJ's resolution has adequate support in the psychological report, Jeske's functional report, and Jeske's hearing testimony. The ALJ did not have to override this evidence with Jeske's inconsistent statements at the hearing. We therefore do not see the ALJ's statements as misrepresenting Jeske's daily-living activities.

The ALJ likewise did not improperly rely upon Jeske's daily-living activities when evaluating whether she was disabled. An ALJ may not equate activities of daily living with those of a full-time job. *Alvarado v. Colvin*, 836 F.3d 744, 750 (7th Cir. 2016). But an ALJ is not forbidden from considering statements about a claimant's daily life. In fact, agency regulations instruct that, in an assessment of a claimant's symptoms, the evidence considered includes descriptions of daily-living activities. *See* 20 C.F.R. § 404.1529(a), (c)(3).

Here, the ALJ did not reason that Jeske's activities of daily living are as demanding as those of full-time work. Rather,

the ALJ considered Jeske's activities to determine whether her symptoms were as severe and limiting as she alleged.

At step three, the ALJ reasoned that Jeske's activities of daily living, alongside other evidence, showed that Jeske's mental impairments were characterized by "no more than moderate limitation[s]" in her ability to understand, remember, or apply information; interact with others; concentrate, persist, or maintain pace; and adapt or manage herself. *See* 20 C.F.R. 404, Subpt. P, App. 1 §§ 12.04, 12.15. In other words, the ALJ considered Jeske's daily-living activities as one factor—among others—indicating that Jeske's descriptions of her mental-functioning limitations were not fully credible. This use of daily-living activities, to assess credibility and symptoms, was not improper. *See Alvarado*, 836 F.3d at 750.

Similarly, between steps three and four, the ALJ mentioned Jeske's daily-living activities when explaining his finding that Jeske "is not as limited as alleged." This credibility determination, like the ALJ's earlier assessment, invited the ALJ's consideration of Jeske's daily-living activities.

Accordingly, Jeske's second argument lacks merit.

## C.  Consideration of Dr. Sturm's Opinion

Third, Jeske faults the ALJ for not discussing one of Dr. Sturm's opinions on Jeske's work hours. Dr. Sturm started seeing Jeske following her back injury in October 2012, and his last treatment visit with her was on April 16, 2013, when he released her from treatment and observed that—apart from avoiding work days exceeding eight hours—she had no restrictions.

Jeske points to the doctor's notes from that last appoint-
ment on April 16. She specifically excerpts his written state-
ment that

> [p]erhaps in 6 or 8 months she will get back to baseline, par-
> ticularly if she can cut back her long work weeks or maybe
> she needs to reduce her work commitment to say 30 hours
> a week, try going part-time to see if this helps her back.
> Maybe sometime later in life she can go back to 40 hours. I
> am not sure if these are options for her, however.

This statement, Jeske argues, mandated specific attention
in the ALJ's decision because it "was patently a[n] opinion
speaking to Jeske's RFC; namely, whether Jeske was able to
perform 8 hour a day, 5 day a week 'regular employment' on
a 'regular and continuing basis.'" Relying on our decision in
*Roddy v. Astrue*, 705 F.3d 631 (7th Cir. 2013), Jeske reasons that
if the ALJ was not going to give this opinion significant
weight, the ALJ needed to explain why.

An ALJ does have to consider opinions from medical
sources on a claimant's RFC—that is, the most a person can
do in a work setting despite the person's limitations. 20 C.F.R.
§§ 404.1545(a)(1), 404.1527(d)(2). Those opinions may be re-
jected only with "an accurate and logical bridge" between the
evidence and the ALJ's decision. *Roddy*, 705 F.3d at 636 (quot-
ing *Craft*, 539 F.3d at 673).

But an ALJ "is not required to mention every piece of evi-
dence." *Craft*, 539 F.3d at 678. In particular, when a treating
doctor opines that a patient can work full eight-hour days
without other restrictions and is improving; observes that the
patient has been working overtime lately; and suggests that
the patient cut back to at- or below-full-time hours to maxim-
ize her improvement, the ALJ does not have to explain why

that last statement is not an opinion about whether the claimant can work full time. That much is obvious from the statement's content and context.

This is the situation we have here. Viewing Dr. Sturm's hour-reduction statement in context, rather than in isolation, it is clear that the comment was not his opinion about whether Jeske could work a full-time job.

For a while after Jeske's injury, Dr. Sturm believed Jeske's condition restricted her to four-hour work days. But by January 10, 2013, he endorsed Jeske's return to an unlimited work schedule. In his progress report from that date, he noted that Jeske's work days were now "9 or 10 hours, sometimes more," and that Jeske had disagreed with his assessment that she could handle unlimited work days. He decided she should "limit her work day to 6–8 hours at this point, since her symptoms may flare-up with long work days."

When Dr. Sturm saw Jeske a week later, he recognized that she was "currently working 6–8 hours a day and makes it through the day" and that her pain was "daily, not necessarily hourly" and gets worse if she lifts anything heavy. He also wrote that Jeske reported 10% overall improvement and that her work restrictions were "the same as [the] last visit, i.e., limit lifting, carrying, pushing, pulling to 40 pounds. Avoid most extensive stooping, bending, stretching, twisting. Limit work day to 6–8 hours."

At a visit the next month, Dr. Sturm opined that Jeske "seems pretty functional … and can do most of her regular job including full days without any hour restrictions. She just tries to avoid lifting heavy caskets and things that are obviously ergonomically challenging." And later that month, Dr.

Sturm wrote that Jeske was "back at work including full-time now. She sometimes works 38 hours over 4 days. In other words, over 9 hours a day. She is trying to avoid heavy lifting, such as lifting coffins, but she can do all the other parts of her job."

Continuing to chart Jeske's progress in March, Dr. Sturm noted that Jeske "reports only 20% overall improvement. However, as we start discussing it further, it sounds to me like she can do her entire regular job. She just avoids awkward lifting." He observed that Jeske "seems very happy with her progress," and he concluded that Jeske's symptoms were "improving." He added that although he believes Jeske has pain that has been limiting, he was "not able to demonstrate a conclusive objective pathology to explain the persistence of her symptoms" and "she is looking a lot better these days."

In the next month, April, Dr. Sturm discharged Jeske from treatment. While he recommended that she refrain from working more than eight hours a day, he concluded that she otherwise had no restrictions. He observed that Jeske had recently "had to work a 55 hour week, which amounted to 10 hours a day plus a 6 hour shift on Saturdays. This just did not work out for her. The constant up and down motions, continuous walking, standing bothered her back." He continued:

> I indicated that perhaps her body is just giving her the message that it is time to cut back on her hours. She has an active family life at home, 4 boys as I recall that can be difficult to keep up with. Maybe she just needs to cut back her work hours to something more reasonable. I will give a suggestion that it would be prudent to limit her work hours to 8 per day to minimize her symptoms. Otherwise, she has no restrictions.

Finally, Dr. Sturm responded to Jeske's question about further improvement. His answer is the statement that Jeske contends is "patently" an opinion speaking to her RFC:

> [S]he is asking if I think she will ever really improve. I think she will. Perhaps in 6 or 8 months she will get back to baseline, particularly if she can cut back her long work weeks or maybe she needs to reduce her work commitment to say 30 hours a week, try going part-time to see if this helps her back. Maybe sometime later in life she can go back to 40 hours. I am not sure if these are options for her, however.

Contrary to Jeske's assertion, this statement about cutting back her hours to "get back to baseline" was not Dr. Sturm's opinion about Jeske's ability to work full time in any job. In the same report, Dr. Sturm opined that Jeske could indeed work full time: eight-hour days with no other restrictions. His comments about cutting back hours referred to Jeske's overtime work schedule, the strenuous demands of her work at the cemetery, and Jeske's hope to improve beyond her current condition, which—in Dr. Sturm's view—allowed her to work eight-hour days at the job she had then.

Dr. Sturm's opinion and progress notes stand in stark contrast to the situation in *Roddy*, 705 F.3d at 636. In that case, the claimant's treating doctor had opined that the claimant could work at most six hours a day, five days a week; could not handle a job full time; and eventually would not be able to remain in the workforce at all. *Id.* Instead of adopting this treating doctor's view, the ALJ adopted the conflicting view of another doctor, who had seen the claimant only once and had not discussed the objective medical evidence of the claimant's degenerative condition. *Id.* at 637. The ALJ did not explain why the treating doctor's opinion should be set aside, leaving the

decision without "an accurate and logical bridge" from the evidence to the conclusion that the claimant could work full time. *Id.* at 636–37 (quoting *Craft*, 539 F.3d at 673).

Here, however, Dr. Sturm saw Jeske's condition as improving, and he consistently opined—from January through April—that she could work a full-time schedule of eight-hour days. So, the ALJ's conclusion that Jeske could work a full-time job did not oppose the opinion of Jeske's treating physician. Quite the contrary, the ALJ gave significant weight to Dr. Sturm's January 2013 report that Jeske could work up to eight hours per day and lift, carry, push, and pull up to 40 pounds. Accordingly, the ALJ did not need to address Dr. Sturm's comment about perhaps reducing Jeske's hours for more improvement.

And so, Jeske's third argument meets the same end as her first two.

### D. *Function-by-Function Assessment of Residual Functional Capacity*

Fourth, Jeske argues that the ALJ failed to include a function-by-function assessment of her RFC. She relies on Social Security Ruling 96-8p, which binds all components of the Social Security Administration. *See* 20 C.F.R. § 402.35(b)(1); *Nelson v. Apfel*, 210 F.3d 799, 803 (7th Cir. 2000).

The Ruling emphasizes that the ALJ must identify an individual's functional limitations before expressing the RFC in terms of exertional levels (i.e., sedentary, light, medium, heavy, and very heavy). SSR 96-8p, 61 Fed. Reg. 34474, 34475 (July 2, 1996). Otherwise, the Ruling explains, the adjudicator could "overlook[] some of an individual's limitations or restrictions." *Id.* at 34476. It goes on to say that the adjudicator's

assessment must address the claimant's exertional and non-exertional capacities, *id.* at 34477, and that exertional capacity "defines the individual's remaining abilities to perform each of seven strength demands: [s]itting, standing, walking, lifting, carrying, pushing, and pulling." *Id.* The Ruling instructs that each function must be considered separately. *Id.* Jeske argues that this requirement imposes a rigid rule upon the ALJ to write about each of the seven strength-demand functions, which the ALJ here did not do.

Jeske is right that the ALJ did not organize his discussion to include a section addressing each of the seven strength functions, one by one. We join our sister courts, however, in concluding that a decision lacking a seven-part function-by-function written account of the claimant's exertional capacity does not necessarily require remand. *See, e.g.*, *Mascio v. Colvin*, 780 F.3d 632, 635–36 (4th Cir. 2015); *Hendron v. Colvin*, 767 F.3d 951, 956–57 (10th Cir. 2014); *Cichocki v. Astrue*, 729 F.3d 172, 177 (2d Cir. 2013) (per curiam); *Bayliss v. Barnhart*, 427 F.3d 1211, 1217 (9th Cir. 2005); *Depover v. Barnhart*, 349 F.3d 563, 567–68 (8th Cir. 2003).

Our role is to determine whether the ALJ applied the right standards and produced a decision supported by substantial evidence. *See* 42 U.S.C. § 405(g); *Clifford*, 227 F.3d at 869. The ALJ's explanation must enable us to meaningfully carry out that role. *Cf. Mascio*, 780 F.3d at 636–37. But if we can tell that the ALJ considered the claimant's ability to perform all seven functions, we need not remand to have the ALJ better articulate its analysis on the claimant's exertional capacity. Of course, if the ALJ does not articulate findings on a function, the risk is greater that we will conclude the ALJ failed to consider it. Yet, the lack of an explicit finding does not necessarily

prevent us from concluding that the ALJ appropriately considered a function.

For example, under certain circumstances, we may determine that the ALJ implicitly found a claimant not limited in performing a function. *Cf. Depover*, 349 F.3d at 567–68. This is in part because an ALJ must find no limitation in a function if the claimant has not alleged such a limitation and the record lacks information indicating one exists. SSR 96-8p, 61 Fed. Reg. at 34475. When those conditions are met, we may conclude that the ALJ found no limitation in that function, without the ALJ stating so explicitly.

Similarly, if the claimant alleged a functional limitation, the ALJ validly found that allegation not credible, and the evidence does not otherwise indicate a limitation in that function, we may conclude that the ALJ considered the function and found no limitation in it, even if the ALJ did not revisit the topic to put that finding into so many words. *Cf. Hendron*, 767 F.3d at 957.

Another way we can tell the ALJ considered a function is by looking at how the ALJ analyzed the evidence and discussed the claimant's limitations. If the ALJ discussed evidence on a certain function, that discussion may lead us to find the ALJ considered the claimant's ability to perform it. *Cf. Cichocki*, 729 F.3d at 178. The same is true if the ALJ acknowledges a specific functional restriction when discussing the claimant's exertional level. *See id.*

In the end, so long as the ALJ's discussion shows that the ALJ considered all strength-demand functional limitations in arriving at a conclusion supported by substantial evidence, we need not remand for clearer explanation. *Cf. Depover*, 349

F.3d at 568. To be sure, remand may be appropriate when—despite evidence of a functional limitation—the ALJ fails to assess a claimant's ability to perform that function. *Cf. Mascio*, 780 F.3d at 636; *Cichocki*, 729 F.3d at 177–78. But Jeske has not shown that to be the case here.

Instead, the ALJ's discussion, viewed alongside the whole record, reflects that the ALJ adequately considered Jeske's exertional capacity, including her ability to sit, stand, walk, lift, carry, push, and pull.[10] The ALJ accepted Jeske's reported sitting and standing limitations, and he observed multiple records documenting her normal gait and easy ambulation. The ALJ also acknowledged that Jeske exhibited moderate difficulty squatting and mild trouble tandem walking during the consultative exam, and he explicitly gave significant weight to Dr. Sturm's opinion that Jeske could lift, carry, push, and pull up to 40 pounds but should avoid extensive stooping, bending, stretching or twisting.

Because the ALJ overtly inspected this evidence on Jeske's capacity to perform the seven strength functions, we are convinced that the ALJ considered those functions when determining that Jeske could perform light work with specific restrictions. The evidence also supports this conclusion, and Jeske has not presented an argument otherwise. So, we do not see a reason to remand for a clearer articulation of Jeske's functional limitations.

---

[10] Jeske does not contend that the ALJ failed to properly assess her nonexertional physical capacities.

*E.  Limitations in Concentration, Persistence, and Pace*

Jeske's last argument is that the ALJ failed to account for Jeske's limitations in concentration, persistence, and pace. Jeske did not raise this contention before the district court, nor does she now argue that it went unpreserved because of inadvertence, rather than intentional relinquishment. She simply argues that we should conduct initial review of this alleged error because we review *de novo* the district court's decision upholding the agency's conclusion.

*De novo* review does not prevent us from finding an argument waived. *Cf., e.g.*, *Hassebrock v. Bernhoft*, 815 F.3d 334, 341–42 (7th Cir. 2016) (finding argument waived when reviewing summary judgment *de novo*). And our review in cases over agency decisions awarding or denying social security benefits is just one tier in a review sequence. *See Kendrick v. Shalala*, 998 F.2d 455, 457 (7th Cir. 1993). In this tiered structure, arguments not presented to the Appeals Council are not waived, but arguments omitted before the district court are. *See Shramek v. Apfel*, 226 F.3d 809, 811 (7th Cir. 2000).

Jeske asks us to depart from this structure by stepping ahead of the district court in evaluating her fifth claim. But she has not told us why we should do so, apart from suggesting that we can and so we should. That is not enough to overcome waiver here.

### III. CONCLUSION

We AFFIRM the judgment upholding the agency's decision that Jeske was not disabled from January 1, 2014 through September 20, 2017.