NONPRECEDENTIAL DISPOSITION
To be cited only in accordance with Fed. R. App. P. 32.1

# United States Court of Appeals

**For the Seventh Circuit**
**Chicago, Illinois 60604**

Argued November 18, 2020
Decided February 2, 2021

**Before**

DIANE S. SYKES, *Chief Judge*

MICHAEL S. KANNE, *Circuit Judge*

DIANE P. WOOD, *Circuit Judge*

No. 19-3298

| | |
|---|---|
| RONDA LUCILLE STOCKS, | Appeal from the United States District |
| *Plaintiff-Appellant,* | Court for the Southern District of Indiana, |
| | New Albany Division. |
| *v.* | |
| | No. 4:18-cv-00125-DML-SEB |
| ANDREW M. SAUL, | |
| Commissioner of Social Security, | Debra McVicker Lynch, |
| *Defendant-Appellee.* | *Magistrate Judge.* |

**ORDER**

Ronda Stocks applied for disability insurance benefits, mainly alleging post-traumatic stress disorder, depression, and anxiety. An administrative law judge assigned "little weight" to her treating psychologist's opinion and denied her application. The district court upheld this decision. We conclude, however, that the ALJ did not "minimally articulate" good reasons for his decision not to give Stocks's treating physician's opinion controlling weight. We therefore vacate the judgment and remand for further proceedings.

**I**

Stocks applied in October 2014 for Title II disability insurance benefits, alleging a host of mental and physical impairments. She later amended her onset date to October 9, 2014, when she first sought mental health treatment.

After years of reporting depression and anxiety to her primary-care provider, nurse-practitioner Paula Scheidler, and periodically taking medication, Stocks began psychotherapy in October 2014 with psychologist Dr. Joan Davis, Psy.D. Stocks related that she has experienced suicidal ideations, depression, anxiety, panic attacks, as well as strong feelings of guilt and grief. She also reported sometimes having poor concentration, memory loss, and emotional instability. Dr. Davis described Stocks as "a very depressed and traumatized woman" and diagnosed her, in part, with post-traumatic stress disorder and depression. She recommended a psychiatric evaluation and continued therapy, but Stocks never followed up.

In December 2014, Stocks met with state-agency psychologist John Terrell, Ph.D. Stocks explained that she applied for disability benefits because she "struggle[d] emotionally" and described her history of depression, panic attacks, and trauma. Her trauma stemmed from a string of serious events: being raped at knife point; seeing her niece "lying out on the highway" after she was killed by a drunk driver; divorcing her first husband; witnessing her mother die of cancer; and coping with her current husband's stroke. Her trauma left her lacking energy and motivation; she "just want[ed] to sleep" and not be "around people." She explained "[t]hings have gotten worse[,]" and, in September 2014, she had jumped out of her car while she and her husband were fighting. She also struggled to take her medication regularly. Dr. Terrell stated that Stocks had easy and appropriate interactions, excellent attention, good recall and verbal reasoning, and coherent thought processes, but that she seemed "generally anxious and depressed." He confirmed her PTSD and depression diagnoses.

The following week, another state-agency psychologist, Ken Lovko, Ph.D., reviewed Stocks's records and made an initial determination that she was not mentally disabled. In Dr. Lovko's view, Stocks had a mild restriction in activities of daily living, and moderate limitations in social functioning and maintaining concentration, persistence, or pace. He reported that Stocks was moderately limited in her ability to understand, remember, and carry out detailed instructions, as well as in her ability to complete a normal workday and interact appropriately with the general public. He also agreed that Stocks had anxiety and affective disorders. But because Stocks did not consistently seek treatment and could "understand, remember, and carry-out unskilled tasks[,]" her limitations were not severe enough to prevent her from working in all

environments. Another agency consultant later reconsidered Dr. Lovko's determination and confirmed his assessments.

Stocks continued to see Scheidler regularly for check-up appointments. In December 2016, Scheidler noted under "history of present illness" that Stocks reported that her anxiety and depression "do[] not interfere with activities of daily living." (The same note appears in Stocks's patient history from March 2015 to June 2016.) In the same record, however, Scheidler noted that Stocks's anxiety "interfere[s] with household activities."

Stocks also began regularly seeing a psychologist, Anthony Lilly, Psy.D. She met with Dr. Lilly eleven times from March to September 2015 and another six times from April to September 2016. Stocks received cognitive and supportive therapy for her trauma, high anxiety, family discord, and extreme anger. To treat her PTSD, Dr. Lilly worked with Stocks to teach her new ways to relax, manage her anger, and effectively communicate.

Dr. Lilly conducted a Mental Residual Functional Capacity Assessment with Stocks in January 2017. First, he assessed Stocks's limitations in sustaining concentration, persistence, and pace: She was markedly limited in her ability to maintain attention and concentration for extended periods, work without supervision, work with others, make simple decisions, and maintain a normal schedule; and she was moderately limited in her ability to maintain regular attendance. Dr. Lilly also assessed marked limitations in her ability to interact with the public, to accept instructions or criticisms, to get along with coworkers, and to maintain socially appropriate behavior; and he assessed a moderate limitation in Stocks's ability to request assistance. Finally, Dr. Lilly noted limitations in the area of adaptation: Stocks was markedly limited in her capacity to respond to changes in a work setting and to travel, and moderately limited in her ability to make plans independently. She was not limited in understanding or memory. Dr. Lilly explained his reasoning by writing "see treatment notes."

After her application was denied again on reconsideration, Stocks appeared before an administrative law judge in early 2017. She testified that she could no longer work because of her PTSD, stress, anxiety, and depression. She reiterated that her PTSD stemmed from the rape and the sight of her niece after she was killed by a drunk driver. She has flashbacks of these events "every time [she] hear[s] a deadbolt" or "a helicopter." She also responded that she suffers from regular "severe" panic attacks, "at least three [times] a week." As for her treatment, Stocks testified to seeing her therapist, Dr. Lilly, monthly and stated that she would see him more if she could afford it. She also explained that she canceled her follow-up session with Dr. Davis (her first

psychologist) because she was put off when the office sent her home with another patient's paperwork.

A vocational expert then testified about work available for a person with the mental limitations described by the ALJ: can do only simple routine tasks with "low stress," meaning no production quotas, pace-rate work, or work involving "arbitration, confrontation, negotiation, supervision, or commercial driving"; and can have only superficial interactions with the public and coworkers with "no intense or intimate contact last[ing] more than five minutes." The vocational expert testified that such a person could not do Stocks's past work but could be a laundry worker or janitor. If she could not tolerate any public contact, she could work as a laundry worker, packager, or industrial cleaner. Under examination from Stocks's counsel, the vocational expert then testified that no jobs would exist if the person were "off task 20 percent of the workday due to inability to concentrate." One or two days off per month, the expert opined, would not preclude employment but recovering from a panic attack once per week would.

The ALJ denied Stocks's application. Applying the administration's five-step analysis, 20 C.F.R. § 404.1520(a)(4), the ALJ determined that while Stocks's disorders were severe, they did not meet or equal a listed impairment. The ALJ assigned a residual functional capacity consistent with the hypothetical claimant described to the vocational expert and accepted that Stocks could not perform any past relevant work. But because she still could perform jobs existing nationwide in significant numbers, the ALJ found that Stocks was not disabled.

As relevant to this appeal, in determining Stocks's residual functional capacity, the ALJ assigned "great weight" to Dr. Terrell's reasoning, because his examination was "generally consistent with the other mental health evidence." The ALJ assigned only "some weight" to the findings of Dr. Lovko because he did not use the agency's new mental health impairment criteria. Finally, the ALJ assigned "little weight" to Dr. Lilly's opinion based on (1) the six-month treatment gap; (2) the focus of the treatment on family discord, anger management, and coping strategies; and (3) the inconsistency of his assessment with Scheidler's notation that Stocks's anxiety did not interfere with her activities of daily living. The Appeals Council accepted review and affirmed the ALJ's decision; the district court upheld its decision.

## II

Although the Appeals Council reviewed the denial of benefits, we nonetheless look back to the decision of the ALJ, because the Appeals Council adopted it except as to a narrow issue regarding the period of disability. See *Arbogast v. Bowen*, 860 F.2d

1400, 1402–03 (7th Cir. 1988). We ask whether the ALJ's decision is supported by substantial evidence, which is evidence a "reasonable mind might accept as adequate to support a conclusion." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).

On appeal, Stocks contends only that the ALJ improperly afforded "little weight" to the assessment of Dr. Lilly, her treating psychologist. Under the treating physician rule applicable to claims filed before 2017, an ALJ who chooses not to credit a treating source's opinion "must offer good reasons for doing so and must address the appropriate weight to give the opinion." *Stage v. Colvin*, 812 F.3d 1121, 1126 (7th Cir. 2016); see 20 C.F.R. § 404.1527(c). The ALJ should weigh the opinion based on the length, frequency, nature, specialty, and extent of the treatment relationship, as well as its consistency and support in the record. *Larson v. Astrue*, 615 F.3d 744, 751 (7th Cir. 2010); see 20 C.F.R. § 404.1527(c)(2)–(5).

The ALJ discounted Dr. Lilly's assessment for three reasons: (1) there was a gap of six months during Dr. Lilly's treatment of Stocks; (2) his treatment notes focused on family discord, anger management, and coping strategies; and (3) Stocks reported to Scheidler that her anxiety did not interfere with her activities of daily living. We must decide whether the ALJ adequately considered the required factors under § 404.1527(c), and if he built an "accurate and logical bridge" from the evidence to his decision to discount Dr. Lilly's opinion. See *Jeske v. Saul*, 955 F.3d 583, 587 (7th Cir. 2020) (quoting *Dixon v. Massanari*, 270 F.3d 1171, 1176 (7th Cir. 2001)).

The Commissioner emphasizes that the ALJ, when determining whether to give controlling weight to a treater's opinion, does not need to list every factor in the regulation; he must only "minimally articulate" his reasons. See *Elder v. Astrue*, 529 F.3d 408, 415–16 (7th Cir. 2008). Stocks gives short shrift to this standard and incorrectly argues that the ALJ must explain how every factor applies. The truth, however, lies somewhere in the middle of these two extremes. It is not the case, as the Commissioner seems to suggest, that any reason, if minimally articulated, automatically justifies the ALJ's discounting of a treater's opinion. The ALJ must still support his conclusions with "substantial evidence," and in the context of rejecting a treater's opinion, must provide "good reasons." *Stage*, 812 F.3d at 1126. In this case, the ALJ fell short with respect to Dr. Lilly.

First, as Stocks correctly points out, the ALJ breezed over the extent of the treating relationship, mentioning only the gap in treatment. See § 404.1527(c)(2)(i)–(ii). The ALJ's exclusive focus on the six-month gap (which the ALJ did not ask Stocks to explain) paints an unbalanced picture of the relationship. Dr. Lilly and Stocks met

seventeen times from March 2015 through September 2016, while Dr. Terrell, whose opinion was given more weight, met with Stocks only once, and Dr. Lovko did not examine her at all. Stocks further testified at the hearing that she continues to see Dr. Lilly once a month as recommended and would be seeing him more if money permitted.

The ALJ's next concern—that Dr. Lilly's treatment focused on family discord, anger management, and coping strategies—also is no reason for discounting his opinion. It is possible that the ALJ meant to comment on the treater's area of expertise, which is a regulatory factor. But that is not what the ALJ said, and without more explanation it is difficult to understand why his observation about Stocks's counseling supports a decision to assign Dr. Lilly's assessment little weight. Dr. Lilly's notes are clear that family discord and anger issues were among the stressors that exacerbated Stocks's depression, anxiety, and PTSD—the very conditions she claims are disabling. And the ALJ did not explain why teaching "coping strategies" is not consistent with treating Stocks's mental illnesses. Further, the ALJ's statement is not wholly accurate; Dr. Lilly's treatment focused heavily on Stocks's trauma.

The ALJ's final rationale—that Dr. Lilly's opinion conflicted with Stocks's report to Scheidler that her anxiety did not affect her activities of daily living—is also insufficient as a reason to discount Dr. Lilly's assessment. When an ALJ discounts a treating psychologist's opinion, he must explain how it was "necessarily inconsistent" with other medical evidence. See *Gudgel v. Barnhard*, 345 F.3d 467, 470 (7th Cir. 2003) (citing cases). Dr. Lilly's assessment found Stocks markedly or moderately limited in areas of sustaining concentration, persistence, and pace, interacting socially, and adaptation; he did not address whether her anxiety and depression affected her activities of daily living. Those include things like personal hygiene, dressing, eating, and mobility; they are distinct from the ability to interact socially, to adapt, and to maintain persistence, concentration, and pace.

Further, as Stocks points out, Dr. Lilly's assessment is not inconsistent with much of the record. All the doctors (and the ALJ) agree that she suffers from PTSD and affective disorders. Stocks reported poor concentration and memory loss to Dr. Davis. Even Dr. Lovko, who opined that Stocks's limitations were not severe enough to prevent her from working, found that she was moderately limited in her ability to understand, remember, and carry out detailed instructions, complete a normal workday, and interact appropriately with the general public. An ALJ must "consider all relevant medical evidence and cannot simply cherry-pick facts." *Denton v. Astrue*, 596 F.3d 419, 425 (7th Cir. 2010). This is crucial when assessing mental illness because

she "will have better days and worse days, so a snapshot of any single moment says little about her overall condition." *Punzio v. Astrue*, 630 F.3d 704, 710 (7th Cir. 2011).

The Commissioner responds that the ALJ's reasoning is clear when taken as a whole. The Commissioner argues that Dr. Lilly's assessment was "at odds" with his own treatment records and implies that Stocks's symptoms result from her inconsistent treatment and medication. But we confine our review to the rationale offered by the ALJ. See *Scott v. Astrue*, 647 F.3d 734, 739 (7th Cir. 2011). The Commissioner may not decide the facts, reweigh evidence, or substitute his own judgment of that for the ALJ. See *SEC v. Chenery Corp.*, 318 U.S. 80, 93–95 (1943). The other rationales offered by the Commissioner cannot replace the three distinct reasons the ALJ provided for discounting Dr. Lilly's opinion. Also, to the extent the Commissioner denigrates that assessment as a mere "check box" opinion, he understates it. Dr. Lilly's opinion was supported by his treatment notes, which lend it "greater significance." *Larson*, 615 F.3d at 751.

Had the ALJ afforded Dr. Lilly's opinion significant weight, he would likely have found that Stocks could not work. His findings, in combination with the vocational expert's testimony that no jobs would exist if Stocks lacked the ability to concentrate and was "off task 20 percent of the workday," suggest that Dr. Lilly's opinion could have been decisive.

For these reasons, we VACATE the judgment and REMAND this case to the agency for further proceedings.